## Richmond.

## BOWMAN V. VIRGINIA STATE ENTOMOLOGIST,

### AND

## BOWMAN AND SHULER V. VIRGINIA STATE ENTOMOLOGIST.

November 18, 1920.

1. CONSTITUTIONAL LAW—*Police Power—Cedar Rust Law.*—Acts 1914, p. 49, *et seq.*, commonly known as the cedar rust law, providing for the destruction of red cedar trees which are or may be the source, harbor or host plant for the communicable plant disease commonly known as "orange" or "cedar rust" of the apple, is a valid exercise of the police power of the State for the protection of the public interests, as distinguished from the protection of private interests and this, although the statute allows compensation to the owner of trees, not as a matter of right, and therefore its validity must be tested by the rules which would be applicable if no such compensation were allowed by the statute.

2. NUISANCES—*Cedar Trees—Cedar Rust Law.*—The cedar trees which fall within the condemnation of the cedar rust law would not have constituted either a public or a private nuisance at common law.

3. CONSTITUTIONAL LAW — *Police Power — Nuisances.* — The police power of the State is not limited to dealing with what are nuisances at common law. The legislature has the power to enlarge the category of public nuisances by declaring places or property used to the detriment of public interests or to the injury of the health, morals, or welfare of the community, to be nuisances, though not such at common law.

4. CONSTITUTIONAL LAW—*Police Power—Protection of Property— Public Welfare.*—The public welfare, or the public good, or the public interest, all synonymous terms, is concerned not only with the safety, health, and morals of the people, but also, under certain circumstances, in the protection of property.

5. CONSTITUTIONAL LAW—*Police Power—Nuisances—Food Supply— Spread of Plant Diseases.*—It is for the public interest that the public demand for all wholesome foods may be supplied in reasonable quantities; and, hence, it is for the public in-

terest that established industries, materially contributing to such supply, be not extinguished or seriously impaired in their efficiency by the spread of disease of any kind. And, whatever constitutes a real menace to such supply may be legitimately declared by statute to be a public nuisance and abated as such, although it may not have been such a nuisance, or abatable as such, at common law.

6. CONSTITUTIONAL LAW—*Police Power—Arbitrary Exercise of the Power—Supervision by Courts.*—The legislature may not under the guise of protecting the public interest arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of the police power is not final or conclusive, but is subject to the supervision of the courts.

7. CONSTITUTIONAL LAW—*Police Power—Discretion of Legislature—Presumption in Favor of Validity of Statute.*—A large discretion is vested in the legislature to determine what the interests of the public require and also as to what is necessary for the protection of such interests, and every possible presumption is to be indulged in favor of the validity of a statute.

8. CONSTITUTIONAL LAW—*Police Power—Discretion of Legislature.— Cedar Rust Law.*—Under the circumstances in which, and against the menace to which, the cedar rust law is by its terms made applicable, the remedy of destruction of the trees being absolutely necessary to accomplish the object of the statute, the character of the regulations provided for in the statute is not arbitrary or unreasonable. The statute is designed to accomplish a legitimate public purpose, the means employed have a real, substantial relation to the public object in view, and do not impose an unusual or unnecessary restriction upon the lawful use of private property.

9. CONSTITUTIONAL LAW—*Cedar Rust Law—Equal Protection of the Laws—Special Benefits.*—That the cedar rust law is special in its character, and that certain persons or interests derive special benefit from its operation over and above the benefits to the general public, does not render it invalid as in conflict with the guaranty of the equal protection of the laws contained in the fourteenth amendment of the Federal Constitution, as all persons subject to it are treated alike under the same conditions.

10. CONSTITUTIONAL LAW—*Cedar Rust Law—Due Process of Law—Trial by Jury.*—That the cedar rust law does not provide for a trial by jury in its enforcement does not render it invalid as

in conflict with the guaranty of due process of law contained in the fourteenth amendment of the Federal Constitution and in section 11 of the Constitution of 1902.

11. CONSTITUTIONAL LAW—*Due Process of Law—Trial by Jury.*— It has long been well settled that neither the State nor Federal Constitution guarantees or preserves the right of trial by jury except in those cases where it existed when those Constitutions were adopted.

12. CONSTITUTIONAL LAW—*Due Process of Law—Cedar Rust Law.*— The provisions of the cedar rust law for a preliminary investigation and an ascertainment of the material facts by the State Entomologist in person or by an assistant; requiring notice to the owner prescribed in the statute; giving the right of appeal thereafter to the court "upon all questions involved," notice of which appeal operates as a stay of all proceedings, as set forth in section 7 of the statute, until the appeal is heard and decided; unquestionably afford the due process of law which is guaranteed in such cases by section 11 of the State Constitution and the fourteenth amendment to the Federal Constitution.

13. CONSTITUTIONAL LAW—*Due Process of Law—Abatement of Nuisances.*—The constitutional guaranty of due process of law does not in any case of the abatement of a public nuisance require a judicial investigation.

14. CONSTITUTIONAL LAW—*Due Process of Law—Abatement of Nuisances—Hearing.*—Even in those cases where the nuisance may not be summarily abated without notice to the owner of the property, it is held that the notice to the owner of the proceeding and an opportunity to be heard before a mere ministerial officer or person engaged in abating the nuisance, before the actual destruction of the property, satisfies the constitutional requirement. *A fortiori* such notice and an opportunity to be heard before a judicial tribunal before the destruction of the property is held, beyond all question, to afford due process of law in such cases.

15. STATUTES—*Constitutional Provision as to Title—Cedar Rust Law.*—The cedar rust law is not invalid under section 52, Constitution of 1902, which provides that no law shall embrace more than one object, which shall be expressed in its title.

16. STATUTES—*Constitutional Provision as to Title.*—Although there is more than one subject dealt with in a statute, if the subjects are all congruous, have a natural connection with, are germane to, and are reasonably necessary for the accomplishment of the one object of the statute, the constitutional provision that no law shall embrace more than one object, which shall be expressed in its title, is satisfied.

45

17. STATUTES—*Constitutional Law—Presumption.*—Every statute is presumed to have been enacted in accordance with the constitutional requirements until the contrary is made to appear.

18. CONSTITUTIONAL LAW—*Cedar Rust Law—"Local Option" Feature.*—The cedar rust law is not invalid because of its "local option" feature contained in section 9.

19. NUISANCES—*Public Nuisance—Extent of Nuisance.*—It is not necessary to establish the fact that the ill effects of an alleged nuisance are applicable to an entire community, or that they are the same in their effects upon all who come within their influence.

20. CONSTITUTIONAL LAW—*Cedar Rust Law—Classification of Sections to Which Statute Applicable.*—The classification of those sections of the State where the "orange" or "cedar rust" disease is prevalent as the locus for the conditional application of the cedar rust statute is not arbitrary but in every way reasonable, and hence valid.

21. CONSTITUTIONAL LAW—*Equal Protection of the Laws—Local Option Power.*—The local option legislative power has never been regarded as in conflict with the equal protection clause of the Federal statute. It is under this power that matters of local government, including even the adoption, as well as the enforcement, of police regulations, are universally held to be validly delegated by statute to the local authorities of municipalities.

22. CEDAR RUST LAW—*Evidence as to Menace of Cedar Trees—Case at Bar.*—In proceedings instituted under the cedar rust law, the circuit court, upon appeal to it, as provided for by the statute, did not err in admitting and considering, over the objection of the owners of the trees, evidence showing the circumstances which in fact existed in the immediate locality in question and in other adjacent localities in the valley and Piedmont sections of Virginia, which rendered the red cedar trees involved in the proceedings a real menace to the apple orchard industry by reason of their being at least a material link in the chain of real menace which exists, not only to the orchards within one mile of them, but to all orchards within the district and county and sections of the State aforesaid, where the red cedar trees have not been destroyed.

23. CONSTITUTIONAL LAW—*Cedar Rust Law—Provision for Assessment of Owners of Apple Orchards.*—In proceedings on appeal to the circuit court by the owners of cedar trees, as provided by the cedar rust law, the question of the constitutionality of section 8 of the cedar rust law, providing for the annual assessment against owners of apple orchards, to provide a fund to reimburse the county for costs and damages paid out to

the owners of red cedar trees destroyed under the statute, does not arise, as the owners are not dependent on these provisions for payment of the damages awarded them, the county and the orchard owners being alone concerned with the validity of these provisions. Moreover, in the instant case, certain persons had agreed to pay the damages in the event the statute was held to be valid, and the owners have accepted this agreement as a satisfactory guarantee to them.

Error to a judgment of the Circuit Court of Shenandoah county, in a proceeding under the cedar rust law, ordering the destruction of certain cedar trees.

*Affirmed.*

These proceedings were instituted under the statute approved March 4, 1914 (Acts 1914, p. 49, *et seq.*), commonly known as the "cedar rust law;" came to the court below on the appeal of the owners of the trees involved under the provisions of the statute; and they assail the validity of the statute on the several grounds mentioned and dealt with in the opinion below.

The said owners of said trees will be hereinafter referred to as the owners.

The sections of the statute which are especially involved in these proceedings are as follows:

"1. Be it enacted by the General Assembly of Virginia that it shall hereafter be unlawful within this State for any person, firm or corporation to own, or keep alive and standing upon his or its premises, any red cedar tree, or trees (which are or may be) the source, harbor or host plant for the communicable plant disease commonly known as 'orange' or 'cedar rust' of the apple, and any such cedar trees when growing within a radius of one mile of any apple orchard in this State, are hereby declared a public nuisance and shall be destroyed as hereinafter provided, and it shall be the duty of the owner or owners of

any such cedar trees to destroy the same as soon as they are directed to do so by the State Entomologist, as hereinafter provided.

"2. In any county in this State where the above mentioned disease exists, or there is reason to believe it exists, it shall be the duty of the State Entomologist, in person or by an assistant, upon the request in writing of ten or more reputable free-holders of any county or magisterial district, to make a preliminary investigation of the locality from which said request is received to ascertain if any cedar tree or trees in said locality are the source of, harbor or constitute the host plant for the said disease known as 'orange' or 'cedar rust' of the apple, and constitute a menace to the health of any apple orchard in said locality, and that said cedar tree or trees exist within a radius of two miles of any apple orchard in said locality. If upon such preliminary investigation of the localities from which said request is received it shall appear that there are cedar trees which constitute the source, harbor or host plant of said disease, and that said cedar tree or trees exist within a radius of two miles of any apple orchard or orchards in said locality and constitute a menace to the health of said apple orchard or orchards, the State Entomologist, or his assistant, shall give notice in writing to the owner or owners of said cedar tree or trees to destroy the same; such notice shall contain a brief statement of the facts found to exist whereby it is deemed necessary or proper to destroy said cedar trees and call attention to the law under which it is proposed to destroy said cedar trees, and the owner or owners shall within such time as may be prescribed in such notice by the State Entomologist cut down and destroy said cedar trees.

\*　　　\*　　　\*　　　\*

"7. Any owner finding objection to the order of the State Entomologist in requiring him to destroy his cedar tree or trees may appeal from said order to the circuit court of the county in which said trees are located, but said appeal must be taken within fifteen days from the date upon which the notice to destroy the same is served upon him. Notice in writing of said appeal must be filed with the clerk of said court who shall forthwith transmit a copy thereof to the State Entomologist. The filing of said notice shall act as a stay of the proceedings of the State Entomologist until it is heard and decided. The court in regular or special session shall thereupon hear the objections, and is hereby authorized to pass upon all questions involved, and determine the amount of damages, if any, which will be incurred by the owner in case said trees are destroyed, and the costs incurred or to be incurred in cutting down trees under section two of this act. If the court should find any damages or such expense sustained, he shall order the amount so ascertained to be paid to the owner by the treasurer of the county out of the general fund of said county, and such order shall be entered by the clerk in the law order book of the said court.

"Sec. 8. Whenever the court orders any damages paid out of the general fund of the county under the preceding section or such amount as the county treasurer may have paid out of the general fund of the county under section five of this act, the said county fund shall be reimbursed by a specific levy of not exceeding one dollar per acre on all apple orchards planted ten years or more, and not exceeding fifty cents per acre on all orchards planted more than two years and less than ten years, in each magisterial district in which this law shall have become operative as hereinafter provided. The court awarding damages shall direct the commissioner of the revenue for the district or districts in which the law has become operative to report at

the next annual assessment the names of all owners of apple orchards, over two years old and less than ten years old, and all owners of apple orchards over ten years old in each district or districts together with the number of acres of orchards owned by each person.

"The court shall thereupon fix such specific amount per acre to be paid by each such owner as will in the aggregate net the amount necessary to reimburse the county fund for all damages and costs previously paid out under the provisions of this act.

"The court shall enter an order directing each owner to pay his respective portion so ascertained to the county treasurer, which said order shall have the full force and effect of a judgment of the court; if said amounts are not paid within thirty days from the date of said order the county treasurer shall proceed to collect the same as delinquent taxes are collected; provided, however, that all damages awarded and assessments made therefor shall be by magisterial districts, each district bearing its own expenses in the enforcement of this act.

"The amount fixed by the court upon orchards planted more than two and less than ten years shall be one-half the amount fixed by the court as a charge upon orchards planted ten years or more.

"9. This act shall not be in force in any county or in any magisterial district of any county until the board of supervisors thereof shall by a recorded vote accept and adopt the same for their county or magisterial district in their county, and such acceptance and adoption shall not make this act operative unless the circuit court of such county by an order duly entered shall ratify and approve the action of the board.

"In the event the board of supervisors of any county neglect or refuse to accept and adopt this act for their county, or for any magisterial district of their county, then

the majority of the qualified voters of said county, or any magisterial district of said county, may request the adoption of this act by petition addressed to the circuit court of said county and when it appears from said petition that a majority of the qualified voters of said county, or any magisterial district of said county, request the adoption of this act, then the said court shall declare the same adopted for such county, or for any magisterial district in such county, requesting its adoption.

"10. An emergency existing by reason of the fact that the season for infection is near at hand, this act shall be in force from its passage."

The cases were heard together by consent of parties and the judgment under review by like consent was a judgment jointly in favor of the owners of the trees ordered to be destroyed.

The trees involved in the cases were ordered to be destroyed by the judgment under review, such judgment providing that the red cedars shall all be cut down, leaving stumps not over four inches high from the ground; those large enough therefor to be cut into fence posts seven and one-half or nine feet in length as the owners may direct, the posts to be closely trimmed; the laps or tops from said posts to be trimmed up, and so much thereof as is over two inches in diameter to be cut into cord wood lengths; the brush to be hauled to some nearby point indicated by said owners and burned at such place or places; the posts and cord wood to be piled or ranked at convenient places nearby, as the property of said owners; said work to be done in a careful manner under the direction of the State Entomologist all at the expense of the county fixed at a certain sum; and that the further sum of $200.00 be allowed the said owners as damages for injury to the land, to be paid to them as aforesaid before the work of cutting of the cedars shall proceed.

The owners raise no question in the cases with respect to the amount of the damages and expenses allowed, but do assail the validity of the statute as aforesaid.

The material facts are referred to in the opinion below:

*Curry & Curry, C. W. Bennick* and *C. B. Guyer,* for the plaintiffs in error.

*John R. Saunders, Attorney General, Ward & Larrick,* and *Tavenner & Bauserman,* for the defendant in error.

Sims, J., after making the foregoing statement, delivered the following opinion of the court:

The following questions raised by the assignments of error will be disposed of in their order as stated below:

[1]  1. Is the act approved March 4, 1914 (Acts 1914, p. 49, *et seq.*), commonly called the "cedar rust law," valid as enacted under the police power of the State for the protection of the public interest, as distinguished from the protection of private interests? And is it a valid exercise of such power?

This question must be answered in the affirmative.

The statute involved in these cases, and the judgment under review in accordance with the statute, allows compensation to the owners, but not as a matter of right. The validity of the statute must be tested by the rules which would be applicable if no such compensation were allowed by the statute.

These cases have been ably presented and argued by learned counsel on both sides of the controversy, and we have been greatly aided in the decision of the cases by their exhaustive research of the authorities.

[2, 3]  (a) It is true that the cedar trees which fall within the condemnation of the statute would not have constituted either a public or a private nuisance at common law.  Wood on Nuisances (2nd ed.), p. 121; *Idem.* (3rd ed.), pp. 148-9; 29 Cyc. 1156; *Roberts* v. *Harrison,* 101 Ga. 773, 28 S. E. 995, 65 Am. St. Rep. 342; 21 Am. & Eng. Enc. of Law (2nd ed.), pp. 692-3.  But the police power of the State is not limited to dealing with what are nuisances at common law.

As said concerning the "police power" in *Lawton* v. *Steele,* 152 U. S. 133, 14 Sup. Ct. 499, 38 L. Ed. 385: "It is universally conceded to include everything essential to the public safety, health and morals and to justify the destruction and abatement * * of whatever may be regarded as a public nuisance * *.  Beyond this, however, the State may interfere whenever the public interests demand it * *."

As said in note to 77 Am. St. Rep., p. 221: "The legislature has the power to enlarge the category of public nuisances by declaring places or property used to the detriment of public interests or to the injury of the health, morals or welfare of the community, to be nuisances, although not such at common law.  Notes to *Ex parte Keeler,* 55 Am. St. Rep. 799; *Murtha* v. *Lovewell,* 55 Am. St. Rep. 413; *Hurst* v. *Warner,* 47 Am. St. Rep. 545."

As it is said in 6 R. C. L., p. 189: "The police power of the State, never having been exactly defined or circumscribed by fixed limits, is considered as being capable of development and modification within certain limits, so that the powers of government control may be adequate to meet changing social, economic and political conditions.  It is very broad and comprehensive and is liberally understood and applied.  The changing conditions of society may make it imperative for the State to exercise additional powers, and the welfare of society may demand that the State should assume such powers."  And at p. 206 of the same

46

authority it is said: "The police power extends to the enactment of all such wholesome and reasonable laws, not in conflict with the constitution of the State or the United States as they may deem conducive to the public good. This may include legislation to increase industries of the State, develop its resources and add to its welfare and prosperity."

[4] Now the public welfare, or the public good, or the public interest (all synonomous terms) is concerned not only with the safety, health and morals of the people; but also, under certain circumstances, as is universally admitted in the protection of property.

As said in 1 Lewis on Em. Domain (3rd ed.), sec. 6: " * * every property owner * * is bound * * to so use and enjoy his own as not to interfere with the general welfare of the community in which he lives. It is the enforcement of this * * duty which pertains to the police power of the State so far as the exercise of that power affects private property. Whatever restraints the legislature imposes upon the use and enjoyment of property within the reason and principle of this duty, the owner must submit to, and for any inconvenience or loss which he sustains thereby he is without remedy. It is a regulation and not a taking, an exercise of police power, and not of eminent domain." And again, *Idem.* sec 247: " 'To destroy property because it is a public nuisance is not to appropriate it to public use, but to prevent any use of it by the owner, and to put an end to its existence, because it could not be used consistently with the maxim, *sic utere tuo ut alienum non laedas.'* "

Just what circumstances will affect property with a public interest so that the legislature, for the protection of property affected with a public interest, may declare the continued existence of certain property under certain circumstances a public nuisance, it would perhaps be impossible to define so as to embrace all cases. At any rate the courts

have not as yet attempted such a definition, and we shall not embark upon that undertaking. Indeed for the decision of the case before us we do not have to go very far afield to find the principle upon which the protection of property employed in certain industries is regarded, under certain circumstances, as with the legitimate exercise of the police power of the State. Among those industries are those which supply a public demand for food of all wholesome sorts.

[5] It is for the public interest that the public demand for all wholesome foods may be supplied in reasonable quantities; and, hence, it is for the public interest that established industries, materially contributing to such supply, be not extinguished or seriously impaired in their efficiency by the spread of disease of any kind. And whatever constitutes a real menace to such supply may be legitimately declared by statute to be a public nuisance and abated as such, although it may not have been such a nuisance, or abatable as such, at common law. While the evil to be contended against is in such case not of the same magnitude as the menace of disease to human beings, the principle involved in the exercise of the police power to combat the evil is precisely the same in both instances.

Accordingly we find that statutes have been passed by Congress and in a great many of the States (including Virginia) in the exercise of the police power for preventing the spread and for the eradication of disease among animals. These statutes are, for the most part, based, not on the existence of any menace to human health by reason of cattle diseases, but upon their effect upon the animal industry itself and the consequent effect upon the supply of the public demand for animal food. And such statutes have been everywhere upheld as enacted in the legitimate exercise of the police power by the Supreme Court and by the courts of the States, whenever the question has arisen. See

note to 26 L. R. A. 638 and note to 43 L. R. A. (N. S.) 1066.

And acting upon the very same principle several of the States, including Virginia, have enacted crop pest statutes for preventing the spread and for the eradication of diseases among agricultural growths of different sorts, including orchards.

Minnesota has a statute providing for the destruction of noxious weeds, as liable to become detrimental to agriculture. It defines such weeds, among which is wild mustard, and it declares such weeds to be a public nuisance. The statute prohibits owners of land within certain limitations from permitting such weeds going to seed. The board of supervisors is charged with the duty of enforcing the statute. The board is required to give notice to the owner, agent or occupant of the time in which such weeds are to be destroyed, and it is made the duty of the board to go upon the land and destroy the weeds when the owner neglects to do so within the time specified in the notice. The failure of the owner to comply with the notice and his allowing the weeds to go to seed is made a misdemeanor. In *State* v. *Boehm*, 92 Minn. 374, 100 N. W. 95, the validity of this statute was involved, one of the questions raised by the assignments of error being whether the public interest was concerned in the destruction of the noxious weeds so as to render the statute valid as enacted in the exercise of the police power. The court said: "It is clear from an inspection of the entire act, excerpts from which have been quoted, that the legislature intended to adopt a reasonable plan for the eradication of noxious weeds * * from lands owned by private parties. While the police power is most frequently exercised for the preservation of the public safety, public health and public morals, still its use is not limited to such purposes. Such enactments have been upheld involving a variety of subjects * * " (citing cases).

"This being an agricultural State, the enactment falls within the principles declared in the cases cited and is but a reasonable exercise of the police power for the general public welfare."

To the same effect is the case of *Wedemeyer* v. *Crouch*, 68 Wash. 14, 122 Pac. 366, 43 L. R. A. (N. S.) 1090, in which the Washington statutes involved provided that certain thistles and mustard and other weeds, liable to become a pest and detrimental to agricultural interests, were "declared to be noxious weeds," and the statutes contain similar provisions to those in the Minnesota statute aforesaid.

In *Balch* v. *Glenn*, 85 Kan. 735, 119 Pac. 67, 26 Am. & Eng. Anno. Cas. (1913-A) 406, 43 L. R. A. (N. S.) 1080, the statute of Kansas is involved which has for its object the extermination of the San Jose scale and other orchard pests. This statute created the entomological commission of the State, composed in part of certain entomologists, who under the statute are charged with the duty of enforcing it. They are authorized to go upon the premises of any private individual and inspect, destroy, treat or experiment upon the San Jose scale, or other injurious insect pests, or plant diseases. In case they find such insects or diseases to exist they are required to mark in some conspicuous way all trees, vines, scrubs or plants so infected, and to give notice in writing to the owner, tenant or person in charge of the premises of the condition thereof. The act then provides that if the owner or person in charge shall not within ten days thereafter destroy or treat the same in accordance with the regulations and rules of the commission, the commission shall cause the work to be done at the expense of the owner. The court held the enactment of the statute a proper exercise of the police power, since it was designed to protect and promote the horticultural interests of the State. On this subject this is said in the opinion of the court: "It cannot be doubted that the

legislature possessed the power to declare that the existence of the San Jose scale, which is well known to be injurious and dangerous to the fruit industry of the State, constitutes a nuisance. The evidence in the case at bar shows beyond question that this particular pest is so prevalent in Sedgewick county as to become a source of great danger to the fruit growers in the community as well as those in other sections of the State. The statute, viewed in the light of the evidence and aided by facts which common experience and observation teach respecting the danger to an important industry in the State from the presence of insect pests, must be regarded as appropriate and * * a proper exercise of the police power. Similar laws have been upheld in other States. Thus in *Los Angeles County* v. *Spencer,* 126 Cal. 670, 59 Pac. 202, 77 Am. St. Rep. 217, it was said: "It is known that the existence of the fruit industry in the State depends upon the suppression and destruction of the pest mentioned in the statute. The act in question is therefore a proper exercise of the police power which the legislature has, under section 1 of article 19 of the Constitution, to subject private property to such reasonable restraints and burdens as will secure and maintain the general welfare and prosperity of the State."

In the *Los Angeles County Case* the statute of California involved was designed to protect and promote the horticultural industry of the State, and declared that all places, orchards, etc., infected with the pests mentioned in the statute are public nuisances, and charged the horticultural commissioners with the duty of enforcing the statute by abating the nuisance, at the expense of the owner of the infected property.

See to same effect *Riverside County* v. *Butcher,* 133 Cal. 324, 65 Pac. 745, involving a later similar statute to that involved in the *Los Angeles County Case.*

In *State* v. *Nelson,* 22 S. D. 23, 115 N. W. 93, 15 L. R.

A. (N. S.) 138, a statute of South Dakota is involved which regulates the nursery business. In the opinion of the court it is said: "* * the power to prescribe regulations calculated to prevent the spread of diseases among plants cannot be less ample than the power to prescribe regulations calculated to prevent the spread of diseases among domestic animals."

In *State* v. *Main*, 69 Conn. 123, 37 Atl. 80, 61 Am. St. Rep. 30, 36 L. R. A. 623, is involved the Connecticut statute (similar to the statute in Virginia, Acts 1889-90, p. 145, requiring the destruction of peach trees infected with the disease known as "Yellows"); and it is therein held that the enactment of such statute was a proper exercise of the police power unless the courts can see that there could be no possibility of any apprehension of substantial danger of the spread of the disease to other peach orchards by allowing the infected trees to live.

In *Colvill* v. *Fox*, 51 Mont. 72, 149 Pac. 496, L. R. A. 1915-F, 895, is involved the statute of Montana authorizing the destruction by the inspector of fruit pests of apples found to be infected with fruit scab, a contagious fruit disease, liable to be communicated to and infect fruit trees of other orchardists. The court held the statute a valid exercise of the police power on the part of the State. And in the opinion of the court this is said: "The mere fact that other orchardists may profit by the destruction of this menace to their fruit trees does not convert the act of destruction from its character as one for the public welfare into one for the private use or benefit of such people."

In *Louisiana State Board* v. *Tanzmann*, 140 La. 756, 73 So. 834, L. R. A. 1917-C, 894, Ann. Cas. 1917-E, 217, is involved the statute of Louisiana authorizing the destruction of orange trees affected by the disease known as "citrus canker," a contagious orange tree disease liable to be communicated to other orange groves in its vicinity and in

the State at large. The statute was upheld as a valid exercise of the police power of the State.

[6] (b) It is true, as said by the Supreme Court in *Lawton* v. *Steele, supra* (152 U. S. 133, 14 Sup. Ct. 499, 38 L. Ed. 385): "The legislature may not under the guise of protecting the public interest arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of the police power is not final or conclusive, but is subject to the supervision of the courts."

As said in 1 Lewis on Em. Domain, sec. 249: "The Supreme Court of the United States, which is the final arbiter upon these questions, says: 'The validity of a police regulation, whether established directly by the State or by some public body acting under its sanction, must depend upon the circumstances of each case and the character of the regulation, whether arbitrary or reasonable, and whether really designed to accomplish a legitimate public purpose. * * If the means employed have no real substantial relation to the public objects which government may legally accomplish, if they are arbitrary and unreasonably beyond the necessities of the case, the judiciary will disregard mere forms and interfere for the protection of rights injuriously affected by such illegal action.' "

See the following authorities cited for the owners to the same effect, or not in conflict with the two paragraphs next above, namely: 8 Cyc. 872; *Laugel* v. *Bushnell*, 197 Ill. 20, 63 N. E. 1086, 58 L. R. A. 268; *Ritchie* v. *People*, 155 Ill. 98, 40 N. E. 454, 29 L. R. A. 79, 46 Am. St. Rep. 315; *State* v. *Redmon*, 134 Wis. 89, 114 N. W. 137, 14 L. R. A. (N. S.) 229, 126 Am. St. Rep. 1003, 15 Ann. Cas. 408; *Bennet* v. *Vallier*, 136 Wis. 193, 116 N. W. 885, 17 L. R. A. (N. S.) 486, 128 Am. St. Rep. 1061; *State* v. *Goodwill* and *Same* v. *Minor*, 33 W. Va. 179, 10 S. E. 285, 6 L. R. A. 621, 25

Am. St. Rep. 863; *Mugler* v. *Kansas City*, 123 U. S. 661, 8 Sup. Ct. 273, 31 L. Ed., at p. 210; *Farmville* v. *Walker*, 101 Va. 323, 328, 43 S. E. 558, 61 L. R. A. 125, 99 Am. St. Rep. 870; *Bristol, etc., Co.* v. *Bristol*, 97 Va. 304, 33 S. E. 588, 75 Am. St. Rep. 783; *Justice* v. *Commonwealth*, 81 Va. 212; *Richmond* v. *Caruthers*, 103 Va. 774, 50 S. E. 265, 70 L. R. A. 1005, 2 Ann. Cas. 495; *Jeremy Imp. Co.* v. *Commonwealth*, 106 Va. 482, 56 S. E. 224, 29 Cyc. 1152-3, 12 C. J. 933, 8 Cyc. 873; note; *Young's Case*, 101 Va. 853, 45 S. E. 327; *Eubank* v. *Richmond*, 110 Va. 740, 67 S. E. 376, 19 Ann. Cas. 186; *Munn* v. *Illinois*, 94 U. S. 113, 24 L. Ed. 77.

[7]   However, as appears from the authorities just cited a large discretion is vested in the legislature to determine what the interests of the public require, and also as to what is necessary for the protection of such interests and every possible presumption is to be indulged in favor of the validity of a statute.

And in the case before us the circumstances shown in evidence are that red cedar trees are numerous in the vicinity of those involved in the instant cases and throughout Piedmont and the Valley of Virginia; that such cedar trees are generally infected with the disease of cedar rust throughout those sections of the State; that in such sections the growing of apples, of certain varieties which are especially susceptible to said disease and for which there is a large public demand, both in those sections and elsewhere, is a large and important industry; that, regardless of the scientific opinion of the origin of the said disease in the past, at the time the statute aforesaid was enacted and when the cases before us arose, it was prevalent in said sections; that the disease moves "from the cedar tree to the apple tree in the spring, and from the apple tree to the cedar tree in the summer and fall," certainly for a distance of one mile, and perhaps more dependent upon

the direction and velocity of the winds, by which the "spores" are borne and are sown broadcast, resulting in the perpetuation and the spread of the disease. That these two kinds of trees being alternating host plants, the spores can infect either kind on which they light, and this being true, an infected orchard may in turn infect cedar trees other than those which caused the original infection, and those newly infected cedars may in turn infect still other orchards, and that this condition can go on throughout the whole district or county if the orchards and cedar trees were located with respect to each other within the radius of infection. That to a large extent at least, the orchards and cedar trees, where the latter have not been destroyed, are so located with respect to each other in the magisterial district and county in which the cedar trees in question in these cases are located, and that the same is true generally speaking throughout the Piedmont and Valley sections of the State. That the disease will die out and be eradicated in said sections of the State if either all the apple trees or all the red cedar trees are destroyed which are located within the radius of infection of each other aforesaid. That the continuance of the disease is dependent upon both of these kinds of trees as its hosts. That the destruction of the red cedar trees in said sections which thus constitute a menace to the apple orchards is absolutely necessary to prevent the extinction therein of the apple industry aforesaid. That the growing of cedar trees in said sections is not an industry. That they are not planted or cultivated, but are indigenous to the soil, springing up where the soil is not cultivated and growing wild. That they are valuable only where they have attained a sufficient size to make fence posts or fuel. That the wood of the red cedar in such sections cannot be used in the manufacture of lead pencils or for any other purposes than for fuel or fence posts. Under the statute in question, all of the parts

of the trees available for fuel or fence posts are left un-destroyed and remain the property of the owner. That the cedar balls which form or grow on such trees of all sizes, and the foliage are the parts which become infected with said disease and are the source from which apple trees are in turn infected therewith. That such are the only parts which are destroyed under the statute, and they have no commercial value and probably little or no value for any purpose. Certainly, as compared with the value of the apple trees, to which their existence is a serious menace, their value is *de minimis.*

The cedar trees in question are shown by the evidence to be all within one mile of some apple orchard containing some of the varieties of apple trees aforesaid, and the presence of other red cedar trees and other such apple orchards within other radii of one mile of each other in other directions are shown by the evidence to exist in such a way that it is practically certain that the continued existence of the cedar trees in question constitutes at least a material link in the chain of real menace which exists not only to the orchards aforesaid within one mile of them, but to all orchards of the character aforesaid within the district and county and sections of the State aforesaid, where the red cedar trees have not been destroyed.

[8] These being the circumstances in which, and such being the menace against which, the statute is by its terms made applicable, and the remedy of destruction aforesaid being absolutely necessary to accomplish the object of the statute, namely, the control and eradication of said disease, we are of opinion that the character of the regulations pro-vided for in the statute is not arbitrary or unreasonable, that the statute is really designed to accomplish a legitimate public purpose, that the means employed have a real, sub-stantial relation to the public object in view, and that they do not impose an unusual or unnecessary restriction upon the lawful use of private property.

[9] (c) That a statute is special in its character, and that certain persons or interests derive special benefit from its operation over and above the benefits to the general public, does not render it invalid as in conflict with the guaranty of the equal protection of the laws contained in the fourteenth amendment of the Federal Constitution, if all persons subject to it are treated alike under the same conditions. *Va. Devel. Co.* v. *Crozer I. Co.*, 90 Va. 126, at pp. 128-9, 17 S. E. 806, 44 Am. St. Rep. 893; *Barbier* v. *Connelly, supra* (113 U. S. 27, 5 Sup. Ct. 35, 28 L. Ed. 923); *Strawberry* v. *Starbuck*, 124 Va. 71, 97 S. E. 362. The statute under consideration falls within this rule of law and is not obnoxious to the amendment of the Federal Constitution in its guaranty just mentioned.

[10] (d) That the statute involved does not provide for a trial by jury in its enforcement does not render it invalid as in conflict with the guaranty of due process of law contained in the fourteenth amendment of the Federal Constitution and in section 11 of the State Constitution.

[11] It has been long well settled that neither the State nor Federal Constitution guarantees or preserves the right of trial by jury except in those cases where it existed when these Constitutions were adopted.

As said on this subject in 16 R. C. L., sec. 33, p. 216: "Special summary proceedings unknown to the common law are not contemplated by the constitutional guaranty under consideration, and are therefore not triable by jury unless the right is given by statute."

(e) What is said under the preceding heading of (d) is likewise true of the provision in section 11 of the Constitution of Virginia that "in suits between man and man trial by jury is preferable to any other and ought to be held sacred." This is not applicable to that class of cases where no jury was allowed at the time the provision of the Constitution was first adopted. Burks' Pl. & Pr., p. 474.

[12]   (f) The provisions of the statute for a preliminary investigation and an ascertainment of the material facts by the State entomologist in person or by an assistant; requiring notice to the owner prescribed in the statute; giving the right of appeal thereafter to the court "upon all questions involved," notice of which appeal operates as a stay of all proceedings, as set forth in section 7 of the statute, until the appeal is heard and decided, unquestionably afford the due process of law which is guaranteed in such cases by section 11 of the State Constitution and the Fourteenth Amendment to the Federal Constitution.   1 R. C. L., p. 790; *Balch* v. *Glenn, supra; County of Los Angeles* v. *Spencer, supra; Riverside County* v. *Butcher, supra; Colvill* v. *Fox, supra; McMillan* v. *Anderson,* 95 U. S. 37, 21 L. Ed. 335; *Lawton* v. *Steele, supra.*

[13, 14]   Indeed, as is said by the Supreme Court in the case last cited: " * * when the property is of little value and its use for the illegal purpose is clear, the legislature may declare it to be a nuisance and subject it to summary abatement.   Instances of this are the power to kill diseased cattle," etc.   In such cases not only is a judicial proceeding unnecessary, but no other preliminary proceeding to ascertain the facts and no notice whatever to the owner is necessary to comply with the due process of law requirement. And the cases, including those just cited, with entire unanimity hold that the constitutional guaranty of due process of law does not in any case of the abatement of a public nuisance require a judicial investigation.   In none of the cases just cited was any judicial investigation provided for, but only that of administrative officials.   And it would seem from the report of the *Los Angeles Case* that the statute therein involved did not provide for any notice to the land owner.   Even in those cases where the nuisance may not be summarily abated without notice to the owner of the property, it is held that the notice to the owner of

the proceeding and an opportunity to be heard before a mere ministerial officer or person engaged in abating the nuisance, before the actual destruction of the property, satisfies the constitutional requirement aforesaid. *A fortiori* such notice and an opportunity to be heard before a judicial tribunal before the destruction of the property is held, beyond all question, to afford due process of law in such cases.

As said in 1 R. C. L., at p. 790: "Statutes providing for the summary destruction of vegetation infected with contagious pests without any preliminary judicial inquiry and without compensation to the owner for the resulting loss are perfectly constitutional, so long as they themselves define what constitutes a nuisance, and there is a right to a subsequent judicial review of the action of the administrative officer."

[15, 16] 2. Is the statute aforesaid invalid under section 52 of the State Constitution, which provides that—"No law shall embrace more than one object, which shall be expressed in its title * * ?"

The question must be answered in the negative.

The assignment of error raising this question does not point out in what particular or particulars it is claimed that the statute embraces more than one object.

The title to the statute is as follows:

"An act providing for the control and eradication of the plant disease, commonly known as 'orange' or 'cedar rust,' in the magisterial districts and counties of this State where said disease is prevalent."

So far as we can perceive the statute embraces but one object and that is expressed in the title. There is more than one subject dealt with in the statute, but they are all congruous, have a natural connection with, or germane to, and are reasonably necessary for the accomplishment of the one object of the statute. This satisfies the constitutional

requirement in question. *Hurley* v. *Hurley,* 110 Va. 31, 65 S. E. 472, 18 Ann. Cas. 968, and cases there cited, to which citation many more cases might be added.

[17] 3. Is the statute invalid because not enacted as directed by section 50 of the State Constitution?

There is no evidence in the cases before us of any character tending to show that the statute was not enacted in accordance with the section of the Constitution mentioned. Every statute is presumed to have been enacted in accordance with the constitutional requirements until the contrary is made to appear. *Anderson* v. *Bowen,* 78 W. Va. 559, 89 S. E. 677.

This question must therefore be answered in the negative.

[18] 4. Is the statute invalid because of its "local option" feature contained in section 9?

This question must be answered in the negative.

The assignment of error which *raises* the question just stated *takes* the position that any provision of law enacted in the exercise of the police power, in order to be valid, must apply to the whole State. It is said that such a statute is valid only when it is "necessary for the welfare of the whole people of the State, in the wisdom and judgment of the legislature * * (and) the act giving force and effect to the legislative discretion cannot be rendered nugatory and of no force and effect at the will of the officials or the people of a county or district. The effect is to make the discretion of a single community superior to the discretion of the law making powers of the State."

This position, in truth, but presents in another form the contention that the statute violates the equal protection clause of the Federal Constitution aforesaid; and it loses sight of the consideration that such clause permits of a wide scope of discretion on the part of the legislature in classification in the adoption of police laws, and also leaves out of consideration the well understood legislative local

option power, so to speak, of permitting localities which may be affected by a police regulation to accept or reject it by vote of the people, or by action of officials of the locality, where a statute is by its terms thus conditioned in its application.

In *Polglaise* v. *Commonwealth*, 114 Va., at p. 850, 76 S. E. 897, it is held: "The equal protection clause of the fourteenth amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without reasonable basis and therefore is plainly arbitrary."

The statute is, (1) not supposed to have been enacted for the welfare of all the people of the State, or even of all of those of a given community; nor does it, (2) undertake to make its provisions applicable to every section of the State, nor is it necessary to its validity that either of these things should be true.

[19] (1) With respect to the subject (1) just mentioned. As is said in reference to the essential features of a public nuisance in 1 Wood on Nuisances, sec. 20: "It is not necessary to establish the fact that the ill effects are applicable to an entire community; or that they are the same in their effects upon all who come within their influence * *."

[20] (2) With respect to the territorial application of the statute necessary for its validity: it is, in general, intended by its terms to be applicable, and reasonably so, in any case only to the magisterial districts and counties of the State where the disease aforesaid is prevalent. Indeed it would be unconstitutional if it had been made applicable in any case in those sections of the State where such disease is not prevalent, for the reasons which are apparent from the authorities and the principles of law above discussed. And, as appears in evidence in the cases before us, there

are sections of the State where said disease is not prevalent and where, at the time those cases were heard in the court below, it was not necessary to destroy the red cedars to eradicate or prevent the spread of the disease aforesaid. Therefore, the classification of those sections of the State aforesaid where the said disease is prevalent as the *locus* for the conditional application of the statute is not arbitrary but in every way reasonable, and hence valid.

[21] It is true that the discretion vested by the statute in the boards of supervisors, subject to the approval of the circuit court, may possibly defeat in some sections of the State the uniform operation of the statute where it could be put in operation under the classification aforesaid. But that is a conditional application of the statute which is permitted by the local option legislative power, which has never been regarded as in conflict with the equal protection clause of the Federal Constitution. It is under this power that matters of local government, including even the adoption, as well as the enforcement, of police regulations are universally held to be validly delegated by statute to the local authorities of municipalities. As said in Cooley on Const. Lim. (5th ed.), p. 147: "Municipal charters refer most questions of local government, including police regulations, to the local authorities on the supposition that they are better able to decide for themselves upon the needs, as well as the sentiments of their constituents, than the legislature possibly can be, and are therefore more competent to judge what local regulations are important, and also how far the local sentiment will assist in their enforcement." The same learned work in the same connection (pp. 146-7) says: "It would * * seem if the question of the acceptance or rejection of a municipal charter can be referred to the voters of the locality specially interested" (which the learned author shows, in preceding paragraphs of such work, can unquestionably be done), "it would be

48

equally competent to refer to them the question whether a State law establishing a particular police regulation should be of force in such locality or not. * * * The same reasons would apply in favor of permitting the people of the locality to accept or reject for themselves a particular police regulation, since this is only allowing them less extensive powers of local government than a municipal charter would confer: and the fact that the rule of law on that subject might be different in different localities, according as the people accepted or rejected the regulation would not seem to affect the principle when the same result is brought about by the different regulations which municipal corporations establish for themselves in the exercise of an undisputed authority." Citing *State* v. *Noyes,* 30 N. H. (10 Fost.) 279, and other cases. In the *Noyes Case* a statute of New Hampshire was involved which declared bowling alleys, situate within a specified distance of a dwelling house, nuisances, but provided that the statute should be in force only in those towns in which it should be adopted in a town meeting. The statute was held to be valid upon the principle stated in the text of the learned work last quoted. See to the same effect *Savage* v. *Commonwealth,* 84 Va. 619, at pp. 622-3, 5 S. E. 565, and *Willis* v. *Kalmbach,* 109 Va. 475, 65 S. E. 342, 21 L. R. A. (N. S.) 1009, involving local option legislation on the subject of licensing the sale of intoxicating liquors, and authorities therein cited, especially *Bull* v. *Read,* 54 Va. (13 Gratt.) 78, involving local option public school legislation, and authorities cited.

Similarly, it is universally held that the uniformity in taxation (which is an exercise of the police power), which is requisite to conform to the equal protection clause·of the fourteenth amendment to the Federal Constitution does not require taxation statutes to be put in force throughout the State. Local option may be given by statute to municipalities, counties and districts within counties to tax dif-

ferent subjects from those taxed throughout the State, and to adopt a different method of taxation from that prescribed for the State at large, without violating the constitutional guaranty just mentioned. If the taxation thus put in force be uniform in its operation within such respective terri- torial limits the constitutional guaranty under considera- tion is satisfied. *Norfolk* v. *Griffin,* 120 Va. 524, 91 S. E. 640, and authorities cited.

The statute was put in force in the case before us by its adoption by the board of supervisors, with the approval of the circuit court, as provided in section 9. But the same principle is applicable as if it had been put in force by a vote of the people of the locality. *Ex parte Basset,* 90 Va. 679, 19 S. E. 453.

[22] 5. Did the court below err in admitting and con- sidering over the objection of the property owners evidence showing the circumstances aforesaid, which in fact existed in the immediate locality in question and in other adjacent localities in the Valley and Piedmont sections of Virginia, which rendered the red cedar trees involved in the proceed- ings a real menace to the apple orchard industry aforesaid by reason of their being at least a material link in the chain of real menace which exists, not only to the orchards of the character aforesaid within one mile of them, but to all orchards of the character aforesaid within the district and county and sections of the State aforesaid, where the red cedar trees have not been destroyed?

This question must be answered in the negative.

As we have seen, in so far as the statute does not sub- mit to any agency the ascertainment of the fact of whether the red cedar trees growing within a radius of one mile of any apple orchard "are or may be the source" of the disease in question; and in so far as the legislature by the terms of the statute has spoken as if its dicta was con- clusive of such questions of fact, the authorities hold, as

above set forth, that "the legislature may not under the guise of protecting the public interest arbitrarily interfere with private business or impose * * unnecessary restrictions upon lawful occupations. In other words its determination as to what is a proper exercise of the police power is not final or conclusive, but is subject to the supervision of the courts." *Lawton* v. *Steele, supra.* And again: "The validity of a police regulation * * must depend upon the circumstances of each case and * * whether * * the means employed * * are arbitrary and unreasonable beyond the necessities of the case." 1 Lewis on Em. Domain, sec. 249. Hence, it is universally held that in such cases the courts have the jurisdiction, and, indeed, are in duty bound, to look to the actual circumstances aforesaid, and unless they are of such nature that the court will take judicial notice of them, they not only are admissible but are indispensably necessary as evidence in the case to enable the court to discharge its duty of adjudicating upon the validity of the statute where its validity is assailed on the ground that its enactment was not in the legitimate exercise of the police power. See the authorities cited in connection with the consideration of the first question stated above.

The statute by its terms does submit to the agency appointed thereby subject to the appeal to the circuit court the ascertainment of a number of the material circumstances aforesaid necessary to show whether the cedar trees in question "are or may be the source" of the disease aforesaid and "constitute a menace to the health of any apple orchard * * * within a radius of *one* mile * * *." (It is admitted in argument before us that the discrepancy in the statute of the use of the language of "one mile" in the first section and "two miles" in the second section is a typographical error, and that "one mile" should be read in both sections where the references to the radius therein mentioned

occur.) This puts the circumstances from which such conclusions of fact are sought to be drawn necessarily in issue before the circuit court on the appeal.

It is true that the statute does not submit to the agency aforesaid the ascertainment of the further circumstances which are sufficient to justify the other conclusions of fact which are necessary as aforesaid to support the statute as a valid exercise of the police power. But it expressly provides in section 7, that the court, on appeal, "shall hear the objections, and is hereby authorized to pass upon all questions involved." Upon the objection to the validity of the statute being interposed on the ground that it was not enacted in a proper exercise of the police power, the existence or non-existence of all such further circumstances therefore became at once questions also involved before the court on the appeal.

Hence the evidence in question was material to the issue before the court and was, therefore, properly admitted and considered by the court.

There remain but two other questions raised by the assignments of error, and they are as follows:

[23] 6. Is the statute invalid in its provisions contained in section 8 for the annual assessment of and judgment by the court against the owner of certain apple orchards for various amounts, in order to provide a fund to reimburse the county for all damages, expenses and costs previously paid out of the general fund of the county, consisting of the damages and expenses which are allowed by the statute to the owners of red cedar trees destroyed thereunder, and certain costs, (1) because such assessment is taxation and is not uniform as is required by the State Constitution: and (2) because the statute provides no notice to the apple orchard owners previous to the assessment and the enforcement of the judgment of the court against them?

Of these questions we deem it sufficient to say that they do not arise in these cases for two reasons:

First, because the fact appears in the record that the owners who are parties to these cases are not dependent on the provisions of the statute here mentioned for payment of the damages, expenses and costs awarded to them in such cases, for the reason that certain persons have agreed to pay such damages, expenses and costs in the event that the statute is held to be valid, and the owners have accepted this agreement as a satisfactory guarantee to them of the payment of such damages, expenses and costs.

Secondly, the statute provides for the payment of such damages, expenses and costs primarily out of the general county fund, so that there can be no question that such damages would, but for said private agreement, be paid to said owners, even if the provisions of section 8 of the statute in respect to the reimbursement of the county aforesaid were invalid. The county and the orchard owners are alone concerned with the questions stated, and neither has raised either of such questions before us.

The judgment under review will be affirmed.

*Affirmed.*