binding bids which it could hold the bidders to, and the transaction was therefore, in effect, a contract based upon the renewal of the offer of the C., W. & P. Construction Company without the renewal of the offer of any other bidders.

None of these questions was raised or passed upon in the trial of the case in the court below, and, as the conclusion we have reached in reference to them disposes of the case, we do not deem it necessary to refer to the questions which were urged in the court below and found by that court to be sufficient to invalidate the contract.

Injunction may be allowed as prayed for.

*Injunction allowed.*

PARDEE, P. J., and FUNK, J., concur.

---

VAN GUNTEN *v.* WORTHLEY, ADMR. OF EUROPEAN CORN BORER CONTROL.

*Constitutional law—Police power—Preservation of food supply by preventing spread of tree and crop infection—All property held subject to taxation, eminent domain and police power—Compensation not prerequisite to reasonable exercise of police power—State may destroy crop or part of crop to prevent greater devastation—Checking and preventing ravages of corn borer—State agricultural department may make orders reasonably necessary therefor —Section 1140-16, General Code (112 O. L., 83)—Order may include plowing up wheat crop.*

1. Reasonable laws, enacted to preserve food supply by preventing spread of infection of trees, orchards, and crops, are within state's police power.

2. Every owner of property holds his title subject to the powers of sovereignty, the rights of taxation and eminent domain and the police power.
3. The exercise of the police power must be reasonable.
4. Compensation for property injured or destroyed is not a prerequisite to reasonable exercise of the police power.
5. If destruction of crop or part of a crop is reasonably necessary to prevent greater devastation, state has full power to pursue course that will conserve food supply, so long as it acts reasonably.
6. Under the Act of March 3, 1927 (112 O. L., 83), Section 5, state department of agriculture may make all orders reasonably necessary to check and prevent ravages of corn borer, even to extent of plowing up wheat crop.
7. Act of March 3, 1927 (112 O. L., 83), Section 5, under which state department of agriculture may make all orders reasonably necessary to check and prevent ravages of corn borer, even to extent of plowing up wheat crop, is constitutional and valid exercise of police power.

(Decided June 20, 1927.)

APPEAL: Court of Appeals for Lucas county.

*Mr. M. O. Rettig,* for plaintiff.
*Mr. Edward C. Turner,* attorney general, *Messrs. Ritter & Brumback,* and *Mr. Gerald Branigan,* for defendant.

WILLIAMS, J. This cause comes into this court on appeal from the common pleas court of Lucas county.

It appears from the petition that the plaintiff, John C. Van Gunten, is the owner of certain described real estate in Adams township, Lucas county; that the defendant, L. H. Worthley, who is administrator of the European corn borer control, unless enjoined, is about to plow up, without compensation to plaintiff, 18 acres of wheat on said

premises, planted in the fall of 1926; that the wheat field in question is one on which corn was previously raised in the summer of the same year, and that the plaintiff has been unable to find corn borers thereon. The plaintiff prays that the defendant may be enjoined from plowing up and from interfering with the wheat crop.

The evidence shows that the facts alleged in the petition are true, except that there are corn borers present in great numbers in the cornstalks left on top of the ground at the time of discing the cornfield and planting the wheat. Tests actually made by gathering all the borers from five square rods of land, one square rod being taken from the center of each quarter of the field and one from the center of the field, show that, unless something is done by way of prevention, there will be produced in growing corn during the summer of 1927, from the cornstalks in the whole wheat field, a total of 720,000 full grown borers. This fact is established by the testimony of D. J. Caffrey, of Arlington, Mass., entomologist for the United States Department of Agriculture.

This expert witness gives a very interesting and detailed description of the breeding habits and devastation of the lepidopterous insect commonly known as the European corn borer. While it chiefly infests the stalk, it also attacks other parts of the corn, and, at times, other plants. It has four stages of development; namely, the egg, the larva, the pupa, and the adult or parent. The egg is laid by the adult or parent moth on the under side of the corn leaf. The egg develops into a larva, which bores into the stalk of the growing corn, where it remains until the following spring. The larva,

while within the stalk, develops into the pupa, which in turn develops into the adult or parent, commonly known as the moth. The pupal state exists about 10 to 20 days, and the moth starts to fly about the last week of June, and continuing, as a rule, through July and the first part of August. Actual experiments show that it will often fly as far as 20 miles.

The corn borer was introduced into the United States from Europe, and was first discovered in this country in 1917. At first its spread was gradual, but in the last two or three years it has been rapid. Thousands of square miles around the shore of Lake Erie, and a considerable territory in Eastern New York and Eastern New England, are affected at the present time. Unless something is done to check its ravages, the raising of corn in the United States will ultimately become an impossibility. No chemical has been found which can be employed successfully for its destruction. To the present time the only effective method of checking its ravages, within the knowledge of entomologists, is the timely destruction of the plant which forms its habitat. Recognizing the necessity of prompt action, the General Assembly and state department of agriculture of Ohio have taken steps for effective organization to that end. As early as July 29, 1925, the state director of agriculture, under authority of Sections 1128 and 1132, General Code, issued a regulation known as official notice of regulation No. 3, European Corn Borer Control, which was made effective August 1, 1925, by which he established a quarantine in various counties in Northern Ohio, including Adams township in this county. On March 3, 1927 (112 O. L., 83), the

General Assembly of Ohio passed an emergency measure, effective on the same day, providing for quarantine and control of the European corn borer. That act makes it unlawful to deny access of the department of agriculture and its authorized agents to any premises necessary to be entered to enforce the provisions of the act, and makes a violation of the act a misdemeanor punishable by fine. Section 5 of the act provides as follows:

"Section 5. Wherever treatment or destruction of any agricultural or horticultural product, whether in field, feed lot, place of assemblage, or storage, or elsewhere, or whenever any special type of plowing or other farm operation is required under the provisions of any rule or regulation issued under the authority of this act, the owner or person having charge of such material or land shall, upon due notice from the department of agriculture, or its authorized agents, and within the time limit provided, cause the destruction or treatment of such material or take the action so required, in the manner designated by such notice. In case the owner or person in charge of such material or land shall refuse or neglect to carry out such instructions within the time limit provided, the department of agriculture, or its authorized agents, may take the action so required and the expense thereof or such portion thereof as the department of agriculture may determine shall be assessed, collected, and enforced as taxes are collected and enforced, against the owner of the premises upon which such expense was incurred. The amount of such expense when collected shall be paid to the department of agriculture and by it paid into the state treasury, provided, that such

portion of the amount, so assessed, collected, and enforced, against the owner of such premises and paid into the state treasury, as shall represent the expenditures thereon by the United States, in carrying out the co-operative control measures thereby authorized, shall be paid to the United States.''

Under the provisions of Section 5, above quoted, on April 20, 1927, an inspector, acting for and on behalf of the department of agriculture of the state of Ohio, verbally ordered and directed the plain- tiff to clean up the wheat field in question by rak- ing, and to haul the cornstalks off and burn them. The plaintiff undertook to comply with this order, but, after working for two days, he made up his mind that he could not clean it up 100 per cent. as required, and so he quit work. On May 12, 1927, he was given written notice to plow the wheat crop under completely on or before May 14, 1927. There- upon the plaintiff filed the action in the court below.

The plaintiff contends that the defendant has no power to cause the crop of wheat to be plowed under in order to destroy the corn borers. It is well established that laws enacted to preserve the food supply, by preventing the spread of infection of trees, orchards, and crops, which are reasonable in their nature, are within the police power of the state. *Bowman* v. *Virginia State Entomologist,* 128 Va., 351, 105 S. E., 141, 12 A. L. R., 1121, and annotation at page 1136. And laws of that char- acter, providing for the destruction of property to prevent the spread of disease among animals, have been held valid where reasonable, although pro- vision was not made for compensation. *Randall* v

*Patch,* 118 Me., 303, 108 A., 97, 8 A. L. R., 65. See annotation at page 70.

How great a menace to the food supply insects are is made plain by an article in Harper's Magazine for March, 1925, by William Atherton Du Puy, entitled, "The Insects are Winning—A Report of a Thousand-Year War." In referring to the war between man and the insects, he says:

"The issue is vital; no less than the life or death of the human race. If man wins, he will remain the dominant species of this earth. If he loses, he will be wiped out by this, his most ambitious racial enemy. * * *

"The foremost world agency in the development of applied entomology has been the United States Department of Agriculture. Its Bureau of Entomology, with some four hundred scientific men employed—the largest agency of its kind in existence—has steadily led the world in this field. Dr. L. O. Howard, its chief, has spent 48 years in its development, and has been an outstanding figure in organizing governmental opposition to insect attack.

"These scientists are the staff officers, the intelligence corps of the thousand-year war. They are able to get perspective on its progress. They set the occasional victory which man has gained over against his more frequent defeats. They balance the ledger and find that man has lost many more fights than he has won. They measure the increase in the strength of the enemy through a generation or a century and find that it is appalling. They visualize the result if developments should continue as they have been for a hundred

or a thousand years. The prospect for man, they hold, is not bright.''

Every owner of property holds his title subject to the powers of sovereignty, the right of taxation, the right of eminent domain, and police power. There are limitations to the exercise of the police power. It must be reasonable. 12 Corpus Juris, 934, Section 443. If reasonably exercised, compensation for property injured or destroyed is not a prerequisite. 12 Corpus Juris, 931, Section 442, and cases cited in note 31. In *Conger, Receiver,* v. *Pierce County,* 116 Wash., 27, 36, 198 P., 377, 380 (18 A. L. R., 393), the court, in referring to the police power, says:

''It has been defined as an inherent power in the state which permits it to prevent all things harmful to the comfort, welfare and safety of society. It is based on necessity. It is exercised for the benefit of the public health, peace and welfare. Regulating and restricting the use of private property in the interest of the public is its chief business. *It is the basis of the idea that the private individual must suffer without other compensation than the benefit to be received by the general public.*'' (Italics ours.)

We quote from the syllabus in *Chicago, B. & Q. Rd. Co.* v. *Illinois,* 200 U. S., 561, 26 S. Ct., 341, 50 L. Ed., 596, 4 Ann. Cas., 1175:

''Uncompensated obedience to a regulation enacted for the public safety under the police power of the state is not taking property without due compensation, and the constitutional prohibition against the taking of private property without compensation is not intended as a limitation of the exercise of those police powers which are necessary

to the tranquility of every well-ordered community, nor of that general power over private property which is necessary for the orderly existence of all governments.''

The rule arises out of the necessity of the case. Its objective is the security of the public health and safety and the general welfare. It is prompted by the instinct of self-preservation as applied to the state. If the food supply is threatened with devastation, a prompt exercise of the police power may save it, and, if the destruction of a small amount of a crop is reasonably necessary to prevent devastation of the whole of that crop, or of another, the state has full power to pursue the course that will conserve the food supply, so long as it acts reasonably.

In the instant case the plaintiff was ordered by the proper authorities to clean up his wheat field at a time when he was able to do so without material injury to his wheat crop. He failed and neglected to comply therewith. Consequently the written order to plow up the wheat field was served on him. The validity of that order depends upon whether it was reasonably necessary to plow it up. The department of agriculture had power to make all orders reasonably necessary to check and prevent the ravages of the corn borer, even to the extent of plowing up the wheat crop, and the law under which such orders may be issued is a constitutional and valid exercise of the police power.

While we are of the opinion that the plaintiff is not entitled to the injunction which he seeks, we are also of the opinion that the cornstalks may be substantially cleaned up from the field and thus save the valuable wheat crop. In accordance with

these views, we have called in the plaintiff and his counsel, and the defendant and his counsel, and advised them of the views herein expressed, and the plaintiff having indicated a willingness to clear the stalks from the field in a substantial manner before the day of final inspection, which is June 18, 1927, has made arrangements with the representatives of the agricultural department to employ men of that department, now engaged in doing that kind of work in connection with the quarantine in this section, to make the clean-up at an agreed price per acre to the plaintiff. This cause is therefore passed for entry of final judgment in order to give these men under contract with the plaintiff a chance to do the work by the date named. The spirit manifested shows a desire to co-operate in maintaining the quarantine. It is possible that mutual tact might have made litigation unnecessary. We believe, however, that much of the trouble in executing the laws in question and carrying out the orders and regulations of the department of agriculture has come from a want of understanding, which will pass away as human beings realize the imperative necessity to join together in a determined co-operation to eradicate and stamp out this evil which threatens to destroy an important part of the food supply.

The entry of the final judgment will be made June 20, 1927.

*Decree for defendant.*

RICHARDS and LLOYD, JJ., concur.