Argued November 19, 1929; modified July 1, 1930

# BIG BUTTE HORSE & CATTLE ASS'N *v.* ANDERSON ET AL.

(289 P. 503)

A. E. *Reames* of Medford (Reames & Reames of Medford, on the brief) for appellant.

*Don R. Newbury* of Medford (Newbury & Newbury of Medford, on the brief) for respondents.

McBRIDE, J. This is a dispute concerning the respective rights of the parties to range their cattle and sheep respectively upon the territory described in the complaint. Such controversies are not new, as we read in the book of Genesis that ''there was a strife between the herdmen of Abram's cattle and the herdmen of Lot's cattle'' each contending that the range was being overpastured. It is unfortunate that the present controversy could not have been settled in the same amicable way that Abram and Lot adjusted their dispute, but unfortunately they have brought the controversy into the realm of litigation, and we are forced to decide by the rules prescribed by the statutes, as interpreted by the courts in a large number of cases, which indicate at least that the ''strife'' between the herdsmen has not abated by the intervention of some thousands of years since the first instance recorded in history. The remedy for an unlawful depasturing of a cattle range finds its origin, as far as this case is concerned, in an act passed by the legislature in

1919, being chapter 175, Laws of 1919, now comprising sections 9521, 9522 and 9523, Oregon Laws. The statute, including the title, is as follows:

"An act regulating the rights of cattle growers and sheep and goat growers to range in Jackson county, Oregon, and providing for a penalty to be recovered by cattle growers against sheep and goat growers infringing upon the rights of such cattle growers as herein fixed.

"Be it enacted by the people of the state of Oregon:

"Section 1. No person owning or having charge of sheep or goats shall herd, graze, or pasture the same, or permit or suffer them to be herded, grazed or pastured, on any cattle range in Jackson county, Oregon, usually occupied by any cattle grower, either as a spring, summer or winter range for his cattle.

"Section 2. Priority of possessory right, between cattle owners and owners of sheep or goats or both, to range in Jackson county, Oregon, shall be determined by the priority in the usual and customary use of such range, either as cattle range or sheep or goat range.

"Section 3. Every person owning any sheep or goats, and every person having charge thereof, who shall herd, graze or pasture any such sheep or goats, or who shall suffer the same to be herded, grazed or pastured on any cattle range in Jackson county, usually occupied by any cattle grower either as a spring, summer or winter range for his cattle, shall be liable to such cattle owner for a penalty of not more than $100 for each day, or portion thereof, which he shall so herd, graze or pasture said sheep or goats upon such range, which penalty may be recovered by the person entitled thereto in an action at law."

■ The law, while definite on its face, fails to fully define the term "range", and we must find that definition from other sources: Webster's Dictionary defines a "range" briefly as "a region in which cat-

tle or sheep may pasture.'' The Century Dictionary, page 4955, sub-div. 7, amplifies this definition as follows:

''A tract or district of land within which domestic animals in large numbers range for subsistence; an extensive grazing ground; used on the great plains of the United States for a tract commonly of many square miles, occupied by one or by different proprietors, and distinctively called a cattle, stock, or sheep range. The animals on a range are usually left to take care of themselves during the whole year without shelter, excepting when periodically gathered in a 'roundup' for counting and selection, and for branding, when the herds of several proprietors run together.''

The definition is quoted with approval in *State v. Omaechevviaria,* 27 Idaho 797 (152 P. 280). As we shall have occasion hereinafter to refer to this case, we shall follow the precedent set by counsel and refer to it as ''the Greek's case'' to avoid dislocation of the jaw in attempting to pronounce it properly. There are numerous definitions of the term ''range'' in the reported cases; but we find none that confine it exclusively to the public domain, although it is perhaps the fact that large stock ranges are more frequently on the public domain than on land partly owned by private parties. We think that the definition which 2 Words & Phrases, First Series, page 1008, takes in effect, from *Holcomb v. Keliher,* 5 S. D. 438 (59 N. W. 227), while not technically covering all situations is substantially correct. It is:

''A cattle range is a large stretch of country, consisting generally of many square miles, which is usually uninclosed, and has no definite or fixed boundaries, on which cattle are permitted to run at large during the entire year.''

The fact that part of the land may be owned by private parties is not necessarily a factor in the definition, if the lands are uninclosed and no objection is made by the private owner to feeding stock over the premises.

█ █ Outside of the government forest reserves, where the occupation and use of the public domain for grazing cattle and sheep is regulated by permits, there has been no technical recognition of the right of citizens to graze their stock on government land. It has been a case of tacit acquiescence on the one hand and on the other, of custom on the part of the stock owner. No one will deny the right of the government summarily to disregard the range custom on government land and to cause such use to be discontinued, or to place it under such restrictions as it chooses. It has never attempted to regulate the relative rights of cattle and sheep owners as to the occupation of these lands for grazing purposes, but has recognized the rights of the states and territories in which they are situated to so regulate them in any manner not inconsistent with the superior jurisdiction of the federal government. The federal decisions agree that, in matters concerning the use of range upon government land lying within a state, the police power of the state extends to the same extent to which it could be exercised over lands in private ownership. That range statutes of a similar character to the one now under consideration may include lands in private ownership is held in *State v. Bidegain,* 34 Idaho 365 (201 P. 312), and *State v. Moodie,* 35 Idaho 574 (207 P. 1073).

█ Our statute is taken substantially from the Idaho statute, and is subject to the rule that a statute of one state adopted by another is presumed to have been adopted with a view to the construction placed upon

it by the courts of the state where it originated. Statutes of this character find their basis in the police power of the state. As has often been remarked, it is easier to say when a particular act is or is not within the police power of a state than to give a general definition applicable to all cases. As a generalization the definition of Justice Earl in *Matter of Application of Jacobs,* 98 N. Y. 98, 108, 50 Am. Rep. 636, may be taken as fairly comprehensive. Speaking of the police power, he says:

"That power is very broad and comprehensive, and is exercised to promote the health, comfort, safety and welfare of society. Its exercise in extreme cases is frequently justified by the maxim *salus populi suprema lex est.* It is used to regulate the use of property by enforcing the maxim *sic utere tuo, ut alienum non laedas.* Under it the conduct of an individual and the use of property may be regulated so as to interfere, to some extent, with the freedom of the one and the enjoyment of the other."

Leaving the domain of generalization and coming down to concrete cases, we may say that it has been held that regulation of the open range between owners of sheep and cattle has been held to be within the police power of the state legislature.

In "the Greek's case" 246 U. S. 343, 346 (38 S. Ct. 323, 62 L. Ed. 763) a statute almost identical with this was held to be within the police power of the state. In that case Justice Brandeis remarks:

"We can not say that the measure adopted by the state is unreasonable or arbitrary. It was found that conflicts between cattle rangers and sheep herders on the public domain could be reconciled only by segregation. In national forests, where the use of land is regulated by the federal government, the plan of segregation is widely adopted. And it is not an arbitrary dis-

crimination to give preference to cattle owners in prior occupancy without providing for a like preference to sheep owners in prior occupancy. For experience shows that sheep do not require protection against encroachment by cattle, and that cattle rangers are not likely to encroach upon ranges previously occupied by sheep herders. The propriety of treating sheep differently than cattle has been generally recognized.''

██ It is true that in ''the Greek's case'' the controversy arose over range upon the public domain, but, as heretofore shown, the distinction between privately owned and governmentally owned land is immaterial. That court held the same in another case, *Bacon v. Walker*, 204 U. S. 311 (27 S. Ct. 289, 51 L. Ed. 499) which involved what is called the ''Two Mile Limit Law'' of Idaho. Many decisions to the same effect may be cited, but to sum up we take it to be the law that, in view of the injury to a cattle range by the introduction of sheep upon it, the state has the undoubted right to pass such statutes as will at least protect the cattle owner from the consequences of unlimited pasturage of land which by custom has become a practically exclusive range. Technically speaking, neither the cattle owner nor the sheep owner has a legal *right* to pasture his band of cattle or sheep on government land or privately owned land without permission, in the one case, of the government, and, in the other, of the private owner. He has a quasi right arising only from acquiescence in the first instance noted, and, in the second case, either from tacit acquiescence, or because the remedy, which the common law afforded the landowner of unfenced land has been taken away in case he chooses to leave his land unfenced.

The law cannot give the cattle or sheep owner any property in the grass of a private land owner or a

remedy for its destruction, but, in view of the tendency of sheep to disregard boundary lines and stray upon land like government land or other land in which the cattleman has a right, by lease purchase or by the tacit acquiescence of private owners, to pasture, it is competent for the state to say that neither the private owner nor his tenant or lessee shall so use the privately owned land as to permit the sheep of such owner or his lessee to so stray or wander upon such cattle range.

That the ranging and herding of sheep in large numbers upon grassland tends to destroy its value for a cattle range has become a matter so generally known as to be of judicial notice in this country. That cattle will not graze to any extent upon land which has been or is being "sheeped" is also almost universally known, and that this condition continues for a year to a longer period, after the sheep have been removed, is a matter of common observation. That the attempt to graze sheep upon a cattle range often results in conflict, strife and even bloodshed is so frequently the case as to be a matter of common knowledge as witness the case of *State v. Smith,* 55 Or. 408 (106 P. 797), and other cases the titles of which escape the memory of the writer. Although many of these collisions never reached this court, it is common knowledge that they were not infrequent. The "strife between the herdsmen" still goes on.

From these well known facts, we conclude, that neither the owner of land within the limits of a cattle range can pasture sheep thereon outside of the limits of his ownership without taking care that they do not stray or wander beyond such limits. We do not hold, necessarily, that such privately owned land must be fenced, although, obviously, this would be the most

efficient method; but we do say that he must exercise such supervision to keep the sheep upon his own land as would be equivalent to fencing, and that, if he fails to do this he violates the statute now under discussion. With this general view of the scope and effect of the statute, we will now proceed to apply it to the facts of the case under consideration.

■ In the case at bar the testimony indicates that the unfenced area designated in the complaint has been most commonly and usually used for the pasturage of cattle. A brief synopsis of the testimony for plaintiff is substantially as follows:

John M. Allen, 67 years of age, had a place within the range, and has pastured cattle there for about thirty-five years,—all over the range. He never saw any sheep or goats on the range. His cattle were pastured all over the unfenced portion of the range, meaning the area indicated in the complaint. He ceased riding the range about 1920. On cross examination witness recalled that there was a "bunch" of sheep on the range about 35 years ago on the Darby place, probably 150 head. They may have herded them down as far as Brownsboro, a small hamlet within the area of the alleged cattle range. They kept them close to the home.

The testimony of Gus Nichols, another witness for plaintiff, is so voluminous that we take the condensed statement of it after comparing it with the transcript, and finding the statement to be fairly accurate, we give the following:

"He testified, that he is 55 years of age, and had been acquainted with the range within these boundaries since he began to ride for cattle at about the age of 12. During the time he rode over this territory every year, spending half his time riding in that sec-

tion, that there never has been a year when he hasn't been riding the range; that it would not be possible for sheep to range there without his knowing it; that sheep leave their trails and it can easily be seen where they have ranged, and that the territory described in the complaint has always been a cattle range as distinguished from a sheep range; that the * * * boundaries described in the complaint is nothing but a cattle range; that there is not much of it enclosed; that the cattle men turn their cattle loose on this range and that they go where they please, except where the land is fenced. Rode that range at all times of the year, but not as much in the summer as in the fall and spring, but considerably during the winter. It has been used continuously for the last 35 or 40 years as a cattle range.

"He had ranged his own cattle there, about 250 head, ever since he was 21, with the exception of a period of two years. When, during these years, the sheep men attempted to bring their sheep within the range, the cattle men leased the flats and the sheep then left. He mentioned the trouble between Ty Matthis, a sheep man, and his uncle, John Nichols, which was testified to by Tom Collins, and in which trouble Matthis shot the horse from under John Nichols. Nichols had leased the lands and had ordered the sheep off. He stated that the sheep did not stay there long after that trouble.

"That since this trouble, which occurred in 1883, there have been two or three bunches of sheep in there that stayed a little while, and they had to be taken out because the flat lands were leased. It had always been a cattle range and that there had always been a fight between the cattle men and the sheep men when the sheep were brought in.

"It was contended that some flats in the Brownsboro territory had been used at times for sheep. As to that he testified that in 1919 they leased all the land about Brownsboro, and that the cattle men all helped

to pay for the lease. This was in the Maupin flat country, and just a short time prior to the taking effect of the law under consideration.

"The purpose of making this lease was to keep the sheep out. There were no sheep on the land at the time. That there had been quite a lot of land so leased for said purposes at different times; that by this method sheep have been kept out, except possibly about two little bunches for a short time a long time ago.

"He testified that the uninclosed lands, whether private or public, are what everybody calls a range; that George Brown had some sheep in there for a short time. He thinks that Phipps had 500 or 600 sheep in there a few miles from Brownsboro, for a short time, that prior to the Brown and the Phipps sheep being in there, he does not know of any other sheep in the territory except a few that Tucker had for a few days only."

Herman Myers, who lives in the vicinity, has not ridden the range for the last 10 years. Prior to that time he was familiar with it. It was used principally during that time as a cattle range. On behalf of plaintiff association, he testified as follows:

"He has been riding this range since he was old enough to ride—a period of about 35 years. That during these years of range riding, he went over almost all of the area, usually riding in November and December. This took him over the territory during each season. He ranged there about 200 head of cattle. That during all of this time it has been a cattle range, as distinguished from a sheep range. It never had been a sheep range to his knowledge; that there have been a few bunches of sheep on it for a little while at a time; that small bunches would get in once in a while in the territory around Brownsboro. But that there was not enough sheep there on the range to make any impression on it; that he never noticed any when he was riding the range; that about 25 years ago there was about 200 to 250 sheep in what is known as the Rocky flat,

for a short time; has never seen any in there since that time; that such sheep as did get into the range were only there for short period, and if they had been there for longer periods they would have left trails, and that he never saw any sheep trails in the territory.''

There were perhaps a dozen witnesses for plaintiffs all together and the foregoing is a fair sample of their testimony as to the comparative use of this range for cattle and sheep. It is impracticable to give all the testimony, but taken as a whole, it is to the effect that the disputed area has been customarily and usually used as a range for cattle for the past 40 years. There have been from time to time occasional incursions on the range by sheep owners but only Phipps and the defendants have ever herded sheep on the range for any considerable time, Phipps about 850 head from the 15th of October, 1918, until about the middle of March, 1919, when he moved them to other quarters whether in deference to the statute under discussion which became effective in May, 1919, or because the feeding had become insufficient, or for other reasons, does not clearly appear.

■ The defendant went upon the lands in the vicinity of Brownsboro in 1922. There is no competent evidence that the owner or owners of the lands, depastured by him, had given him permission to pasture his sheep on these privately owned lands. He says that one Dressler, a real estate agent, had the renting of the lands and gave him the permission, but admits that he has nothing to show that Dressler was the agent of the man who owned the lands. His testimony at the best is a mere conclusion, which he does not attempt to transmute into real authority by calling Dressler or the owner of the lands as witnesses. Some-

where along the line of testimony in regard to agency, the authority of the alleged agent must be traced either by direct or circumstantial evidence to the supposed principal. Failure to do this renders evidence of permission by an alleged agent ineffective for any purpose, and we must therefore hold that the defendant had no such permission from any one authorized to give it, and that he was pasturing his sheep upon unfenced private property within a customary cattle range without authority.

The weight of evidence tends to show that for at least 40 years the unfenced lands, within the boundaries of the alleged range, have been customarily used by the plaintiffs and others as a cattle range by the tacit acquiescence of the United States and the owners of private lands, and a custom to that effect is fully established. That the occasional occupation for brief periods of the privately owned lands by other parties has not been of such a character as to have ripened into a custom, and, indeed, no such custom has been pleaded.

■ Our principal difference with the learned judge, who tried the case below, is upon the question as to whether privately owned unfenced land within the alleged range is a part of such range, and we hold that it is, until the owner, by actual occupation and by fencing or care that shall be equivalent to fencing, shall withdraw it from the range.

We do not deny such owner, or his tenant, the right to pasture sheep upon his own land, but we require him, either by fencing or by such herdsmanship, as shall be equivalent to fencing, to keep his sheep off of other lands within the range, including, of course, other unfenced lands which owners have tacitly acquiesced in their use by cattle owners by making no objec-

tion to their being so pastured by cattle. This seems to us to be within the intent and spirit of the statute, and in accordance with sound public policy, which requires a citizen to yield some of his own convenience for the sake of the general good. In this, however, we desire to proceed cautiously so that hereafter no owner of private lands, or his tenant, shall be discommoded or unduly restricted in the use of his property. In that view, and in view of the fact that the damages already done are not great, but largely a matter of inevitable result in the future and difficult of ascertainment at law, the decree below will be so changed by a decree here as to enjoin defendant from occupying any land within the boundaries named without express permission of the owner, and without either having the same enclosed by a fence sufficient to prevent sheep from straying therefrom, or having them sufficiently herded to prevent them from so straying. Recognizing some hardships from the enforcement of this statute, it shall be further ordered that neither party recover costs or disbursements here or in the lower court.

Coshow, C. J., Rand and Rossman, JJ., concur.