Argued May 3, reargued October 25, affirmed November 9, 1955

# BOWDEN *v.* DAVIS ET AL
289 P. 2d 1100

*Harold Banta* argued the cause for appellants. On the brief were Banta, Silven & Horton, of Baker.

*W. F. Schroeder* argued the cause for respondent. On the brief were Lytle, Kilpatrick & Schroeder, of Vale.

*Robert Y. Thornton,* Attorney General, and *John D. Nichols,* Assistant Attorney General, both of Salem, filed a brief as amicus curiae, urging reversal.

TOOZE, J.

This is an appeal by defendants Oscar Davis and Buck Parmele from a judgment in favor of plaintiff Walter Bowden in an action to replevin 17 head of branded horses, 2 unbranded colts, and 2 branded mules, alleged to be of the reasonable value of $2,625.

The complaint, filed February 28, 1952, contains

the usual allegations of ownership and right to immediate possession of the animals in question, particularly describing them, and also the wrongful and unlawful taking of possession thereof by defendants, and the withholding possession from plaintiff "under claim that the animals were running at large and were gathered under contract with the Bureau of Land Management". The complaint also alleges a demand for possession by plaintiff and a refusal to deliver possession by defendants.

By their answer defendants admitted "that plaintiff is the owner of the horses therein described, subject to the rights of defendants therein as hereinafter set forth"; admitted "that the defendants took possession of said horses and held the same until retaken by the plaintiff under claim and delivery proceedings herein, and that defendants' holding thereof was based upon the claim that the animals were running at large and were gathered under contract with the Bureau of Land Management"; alleged "that prior to being rounded up, the said horses had been running at large on the public domain for several weeks at least"; admitted "that after being rounded up, the said horses were held by defendants and in their possession, within what is known as the Cochran Ranch corral and that plaintiff was so advised"; admitted their refusal to deliver possession of the animals to plaintiff upon his demand "with the qualification that defendants' refusal to deliver the said horses to the plaintiff was not absolute, but merely until the roundup charges had been paid"; and alleged affirmatively that said property was held for an assessment pursuant to statute; that is to say, the roundup charges fixed for gathering said animals. Except as admitted, defendants denied the allegations of the complaint.

For a further and separate answer and defense, defendants affirmatively alleged the following:

## "I.

"That there are situated within Malheur and Harney counties, State of Oregon, a large amount of public domain, comprising many thousands of acres, which is administered by the U. S. Grazing Service, a division of the Bureau of Land Management, Department of the Interior under the Taylor Grazing Act, and that Grazing District No. 3 has been set up pursuant to law to administer such lands or a portion thereof, with headquarters at Vale; that pursuant to the law and regulations of said Department, a District Range Manager is appointed by such government agency to administer, generally manage and supervise the lands within the said grazing district. That during all the times and dates herein mentioned, A. K. Hansen has been and now is District Range Manager in charge of grazing district and agency.

## "II.

"That during and prior to the year 1951, a large number of horses were found to be running at large upon the public lands within the boundaries of said grazing district, being public lands of the United States, without any permit or license of any kind, and the said Grazing Service of the Bureau of Land Management, through the appropriate officials thereof, decided that such horses should be rounded up and impounded and disposed of as provided by law, and for such purpose, on or about November 15th, 1951, acting through the said A. K. Hansen, District Range Manager, thereunto duly authorized entered into an appropriate contract and agreement with the defendants, who were in all respects fit and competent persons therefor, to round up, collect and impound such horses; that under and by the terms of such agreement among other things,

these defendants were appointed agents of the Bureau of Land Management, Grazing Service, for the purpose of rounding up and impounding such horses, and their gathering or roundup fee for so doing was fixed and established at $25.00 per head, which sum included the brand inspection fee and advertising costs, which were to be assumed and paid by defendants, and that such charge was and is fair and reasonable charge under the circumstances; that such contract contemplated that said drive or roundup would begin on December 3rd, 1951, and continue until all such horses within the area upon the open public range had been removed or December 1st, 1952.

## "III.

"That prior to such roundup the said Bureau of Land Management, Grazing Service, the agency causing the said horses to be gathered, had fixed and established a roundup charge of $25.00 per head, to be paid to the defendants as the persons authorized by such agency to carry on the roundup, and payment of such sum by the owner of the animals rounded up would entitle such owner to retake possession thereof, and had confirmed the same as aforesaid in the said contract with the defendants. That prior to such roundup the State Department of Agriculture of the State of Oregon was duly notified and such Department caused James Barrien, a brand inspecter [sic] duly employed and appointed, pursuant to the laws of such state in the area in which the roundup was being conducted to be present and inspect all horses rounded up for brands. That prior to such roundup the said Bureau of Land Management, through the said Hansen, District Range Manager caused a notice to be published of such fact in the Malheur Enterprise, a newspaper of general circulation in the area where the round-up was to be held. That such notice was published twice, more than ten days prior to the time the round-up was to begin (on

November 22nd and 29th, 1951) and was in words
and figures as follows:

"[Copy of notice.]

That such notice was in all respects duly and reg-
ularly published and stated the date the roundup
was to begin, and the place where horses collected
in the roundup were to be held. It also stated that
persons claiming ownership of any such horses
might retake possession of such horses running at
large without license or permit of any kind, upon
payment of the established roundup charge which
was therein set forth.

"IV.

"That following December 3rd, 1951, (the date
so fixed for the beginning of such roundup) pursu-
ant to such contract, the defendants proceeded to
roundup horses running at large upon the public
domain and among other horses, found and rounded
up the horses belonging to the plaintiff and de-
scribed in paragraph I of plaintiff's complaint,
between the dates of February 24th and 26th, 1952.
That such horses when so found and rounded up
were and according to the best knowledge and be-
lief of these defendants had been for several weeks
at least prior thereto running at large upon public
lands of the United States within the boundaries
of such grazing district, and within the area desig-
nated in such notice without any license or permit
whatsoever.

"V.

"That after rounding up such horses and plac-
ing them in said corral at the Craig Cochran ranch
south of Rome, the defendants caused the plaintiff
to be personally and actually notified thereof forth-
with on said February 26th, 1952, and that instead
of paying the roundup fee and reclaiming his horses
as required by law, the plaintiff refused to pay
the roundup fee and immediately commenced this
action and caused the said animals to be forcibly

taken from the defendants' possession without their consent by process of law under claim and delivery proceedings instituted herein.

## "VI.

"That by reason of the premises the defendants were lawfully in possession of the said horses when this action was brought, and were and are entitled to remain in possession thereof until their roundup fees, at the rate of $25.00 per animal or a total sum of $525.00 · for the twenty one animals involved herein, has been paid, and to hold a lien thereon or dispose of such animals as by law provided or as the Bureau of Land Management may direct, unless such roundup fee is paid."

Plaintiff's demurrer to the affirmative defense of defendants, based upon the ground that it did not state facts sufficient to constitute a defense to plaintiff's cause of action, was sustained by the trial court. No amended answer having been filed by defendants, plaintiff's motion for judgment in his favor upon the pleadings was allowed, and judgment was entered accordingly. It is from this judgment that defendants appeal.

The affirmative defense pleaded by defendants is based entirely upon the provisions of ch 211, Oregon Laws 1951 (ORS 607.405 to 607.435), known as the horse roundup statute. By his demurrer plaintiff asserted and, on argument, contended that the statute is unconstitutional and void. The trial court so held. Therefore, the only question for decision on this appeal is whether the roundup statute is constitutional.

The material sections of that statute provide:

"Section 1. When any horses are found to be running at large upon any public lands within this state without license or permit of any kind, such animals may be rounded up by any agency of the State of Oregon or of the United States having the

management or control of such lands and the horses impounded and disposed of as provided in this Act. For such purpose an agency may enter into agreement with competent persons to round up, impound and dispose of horses.

"Section 2. *All unbranded horses rounded up as authorized by this Act shall be deemed* abandoned or wild horses and, as such, *a public nuisance,* and the ownership of such animals hereby is vested in the State of Oregon. The agency causing such animals to be rounded up may dispose of the animals by sale or otherwise in the name of the State of Oregon upon such terms as the agency may deem proper.

"Section 3. *If any horses branded with a brand recorded with the State Department of Agriculture of the State of Oregon are collected in the roundup,* the agency shall notify the owner of the recorded brand by registered letter sent to the address of the owner as shown by the records of the State Department of Agriculture, or by actual notice, that the branded animal is in the possession of the agency or its agent. Prior to a roundup the agency causing the horses to be gathered shall establish a roundup charge not to exceed $25 to be paid to the person authorized by the agency to carry on the roundup and payment of which by the owner of the animal shall entitle him to retake possession. *If the animal is not claimed within two days of receiving the above mentioned notice and the roundup charge paid,* the horse shall be deemed to have been abandoned and the agency or its agent may dispose of the animal upon such terms as it may deem proper.

"Section 4. *If any horses bearing a brand not recorded with the State Department of Agriculture are collected in the roundup and the owner of such horses is not known to the brand inspector* present at the roundup, the animals shall be deemed to have been abandoned and they shall be disposed of in the

same manner provided for disposing of unbranded horses. If the owner of the animal is known to the brand inspector present at the roundup, the procedure specified in the case of animals bearing a recorded brand shall be observed.

"Section 5. Before any roundup authorized by this Act is held, the State Department of Agriculture of the State of Oregon shall be notified. The department shall cause a brand inspector employed under the provisions of chapter 193, Oregon Laws 1949, in the area in which the roundup is to be conducted to be present and inspect all horses rounded up for brands.

"Section 6. Before any roundup of horses is held, the agency responsible for the roundup shall cause notices to be published of such fact in a newspaper of general circulation in the area in which the roundup is to be held. The notices shall be published not less than twice at least 10 days prior to the time the roundup is to begin. The notices shall state the date the roundup is to begin and the place where horses collected in the roundup are to be held. It shall also state that persons claiming ownership of any such horses may retake possession of horses collected from the public lands which have been running at large without license or permit of any kind upon payment of the established roundup charge." (Italics ours.)

Does this statute violate the provisions of the Fourteenth Amendment to the constitution of the United States? Does it violate the provisions of Art. 1, § 18, Constitution of Oregon? In a word, does it deprive plaintiff of his property without due process of law?

Article 1, Section 18, Constitution of Oregon, so far as material, provides:

"Private property shall not be taken for public use  *  *  *  without just compensation;  *  *  *."

Amendment Fourteen, U. S. Constitution, in part provides:

"* * *; nor shall any state deprive any person of life, liberty, or property, without due process of law; * * *."

As a background for our consideration of the issue before us, defendants contend that we should take judicial notice of certain physical and geographical conditions which exist in southeastern Oregon where the situation which the statute was designed to remedy prevails, as well as the nature and propensities of the animals involved. The trial court took such notice, and we believe properly so. *Hill v. Tualatin Academy,* 61 Or 190, 121 P 901; ORS 41.410. We adopt the following statement from defendants' brief:

"There is in the southeastern portion of the State of Oregon, largely within the boundaries of Malheur and Harney counties, a vast area, sparsely populated, largely undeveloped, rough and arid in character, with few water courses or water holes, and almost no roads. The great bulk of this area is still in public ownership and the entire area is useful only for grazing livestock. A great percentage of the county is open range, with few fences or enclosed lands. * * * The only thing that could even be called a town in the whole area is the little settlement of Jordan Valley which lies just west of the Idaho line. Since the enactment of the Taylor Grazing Act in 1934 and the setting up of grazing districts under it (See U.S.C.A., Title 43, Sections 315 to 315r), the public lands of the United States, in the area, which as stated constitute the great bulk of the acreage, are administered through the Grazing Service. The area involved in this action is within Grazing District No. 3, which has its headquarters at Vale. Under the Taylor Grazing Act, an elaborate system of licenses and permits has been set up, and no livestock may now be grazed

upon the public domain, within the boundaries of the grazing districts, except by those holding regularly issued licenses or permits. However, over the years, the problem of trespassing horses upon these public range lands in southeastern Oregon has become acute. As stated by the trial judge in his decision,

" 'For many years past there have been roundups of wild horses in the Owyhee hills, and the public domain in the southern portion of Malheur County. These roundups, many of which occurred even prior to the passage of the Taylor Grazing Act, were for the protection of the range by the elimination of those horses.' "

Prior to the passage of the Taylor Grazing Act, owners of livestock made free use of the public domain for grazing purposes. After the Act became effective, it frequently happened that privately owned livestock, for which license or permit had not been obtained, would be found grazing upon the lands in question, some of which had escaped from the owner's enclosure, and perhaps some of which had been intentionally placed there by the owner in violation of the statute.

It was in the light of all these conditions that ch 211, Oregon Laws 1951, was enacted.

Section 315n, Title 43, USCA, provides:

"Nothing in this chapter shall be construed as restricting the respective States from enforcing any and all statutes enacted for police regulation, nor shall the police power of the respective States be, by this chapter, impaired or restricted, and all laws heretofore enacted by the respective States or any thereof, or that may hereafter be enacted as regards public health or public welfare, shall at all times be in full force and effect: Provided, however, That nothing in this section shall be con-

strued as limiting or restricting the power and authority of the United States.''

This statute recognizes a long-standing rule of law. It has been uniformly held that in matters concerning the use of range upon government lands lying within a state, the police power of the state extends to the same extent to which it could be exercised over lands in private ownership. In other words, the police power of the state extends over the federal public domain within the state unless Congress has determined to deal exclusively with the subject. *Mendiola v. Graham,* 139 Or 592, 601, 10 P2d 911; *Big Butte H. & C. Ass'n v. Anderson,* 133 Or 171, 182, 289 P 503; *Omaechevarria v. Idaho,* 246 US 343, 38 S Ct 323, 62 L ed 763; *U. S. v. Hatahley,* 220 F2d 666.

Under the provisions of the Taylor Grazing Act, the Secretary of Interior is empowered and directed to make rules and regulations respecting the occupancy and use of the grazing lands within the established districts, and to issue or cause to be issued permits to graze livestock thereon. §§ 315a, 315b, Title 43, USCA. Any willful violation of the provisions of the Act or of such rules and regulations thereunder after actual notice thereof is punishable by a fine of not more than $500. § 315a, Title 43, USCA.

There is no provision in the Act requiring that permits be issued only for the grazing of branded animals, nor is there any state law making it mandatory for privately owned livestock to be branded.

However, there is nothing in the Taylor Grazing Act which indicates that Congress intended that any local police measure that does not conflict with the provisions of the Act or the regulations promulgated thereunder should be suspended; on the contrary, the

Act specifically provides otherwise. § 315n, Title 43, USCA, supra.

It follows, therefore, that the legislature of this state has the power to enact legislation in the field undertaken to be covered by ch 211, Oregon Laws 1951. However, that does not mean that in exercising the power the legislature did not go beyond constitutional bounds in enacting this particular statute.

■ It is elementary that every reasonable presumption is in favor of the validity of a statute and the court will not declare a law unconstitutional except in clear cases. The court cannot and will not concern itself with the policy of the law, its wisdom, or expediency, but only with the power of the legislature to enact it. Yet, as we said in *Christian et al. v. La Forge,* 194 Or 450, 462, 242 P2d 797:

> "In all cases it is the duty of the courts to enforce the state's police regulations enacted by the legislature in good faith and with reasonable and appropriate regard for the protection which the state owes to the life, health, and property of its citizens. Yet, it is not only within the power, but it also is the duty, of the courts, when called upon, to decide what constitutes a proper exercise of the police power, whether legislation purporting to be enacted in the exercise of the police power is really such, and whether regulations prescribed by the legislature are reasonable, or are otherwise unconstitutional."

■■ The police power is very broad and far-reaching, and it is difficult, if not impossible, definitely to fix its bounds. It embraces the whole sum of inherent sovereign power which the state possesses, and, within constitutional limitations, may exercise for the promotion of the order, safety, health, morals, and general welfare of the public. However, the legislature is not

the final judge of the limitations of the police power, and, since the legislative action must be reasonably necessary for the public benefit, the validity of all police regulations depends upon whether they can ultimately pass the judicial test of reasonableness. Constitutional limitations must always be observed.

Constitutional limitations upon the power of the state have for their primary purpose the protection of the individual. Under our theory of government, individual rights are sacred rights; rights that rise above all unreasonable attempts by government to interfere therewith. It is only when the interests and welfare of the public in general are clearly threatened by the unrestricted exercise of the individual right that the individual right must give way to reasonable limitation and regulation for the public good. It is the duty of the courts ever to be watchful to protect the personal rights guaranteed by state and federal constitutions, and to prevent encroachment thereon by legislative fiat, unless actually essential to the protection of the public welfare.

"Private property shall not be taken for public use without just compensation", nor shall any person be deprived of "life, liberty, or property, without due process of law" are the constitutional mandates. "Life", "liberty", and "property" stand upon the same footing under this constitutional limitation upon the power of the state. Property is property, whether it consists of much or little, or is of large or small value. If it is owned by an individual and has a lawful use, the individual is entitled to the constitutional protection, and it should not be denied him by the courts.

The term "due process of law" is not susceptible

of exact or comprehensive definition. It is not defined in the constitution itself. Any definition "must depend upon the relation which the particular law bears to the fundamental law which limits the legislative power". In 16 CJS 1141, Constitutional Law, § 567, it is stated:

"In the course of developing its meaning the courts have gone beyond its literal meaning of 'due procedure' and have brought within it *substantive* as well as procedural rights. When applied to *substantive rights* it is interpreted to mean that the government is without right to deprive a person of life, liberty, or property by an act that has no reasonable relation to any proper governmental purpose, *or which is so far beyond the necessity of the case* as to be an arbitrary exercise of governmental power. In the concrete *it means, that in a contest involving these rights he will be accorded the opportunity to contest the propriety of each step in the action sought to be taken against him.*" (Italics ours.)

In *Weinacht et ux. v. Bower*, 140 Or 527, 533, 14 P2d 622, Mr. Justice BELT, speaking for the court, said:

" 'Due process,' as used in the Federal Constitution, implies that the person whose property rights are affected is entitled to his 'day in court.' It means that no person shall be deprived of his property without notice *and an opportunity to be heard.*" (Italics ours.)

There can be no question but that the animals involved in this litigation constitute private property within the meaning of the constitutional provisions, property having a lawful and most important use. Even in this day of the airplane and automobile, the horse still plays an important part in our economic life. In the wide-open, extensive, largely arid, rough

and roadless areas of southeastern Oregon, the horse is an indispensible means of transportation for man, as it always has been. Its value cannot always be measured in dollars and cents, any more than it was so measured in those early days of the West when summary hanging was the usual fate of the horse thief. It is a species of property to which the constitutional mandate applies with full force, and that without regard to its actual monetary value.

Defendants contend that inasmuch as the horses in question were found running at large upon the public domain without license or permit, they were trespassing in violation of the provisions of the Taylor Grazing Act, and by reason thereof might properly be classed as a nuisance. They then say, "that if the animals in question are properly declared a nuisance, they may, in the lawful exercise of the police power, be summarily disposed of by the state without notice or compensation to the owner." In support of their contention, defendants cite a number of authorities. Among them is *Hofer v. Carson et al.,* 102 Or 545, 551, 203 P 323. This case dealt with a state statute respecting dogs running at large. It provided that all dogs running at large should have a shepherd's muzzle made of wire or metal and properly fastened around the nose and neck sufficiently strong to prevent them from biting or injuring any person, sheep, goat or other domestic animal; it also provided that any dog found running at large without such muzzle properly fastened, should be summarily killed by the police.

Mr. Justice RAND, speaking for the court, said (p 548):

"The enactment of laws providing for the control and regulation of the mode of keeping dogs, imposing the payment of license fees upon the

owners and authorizing the summary killing of dogs in violation of law is an exercise of the police power of the state and is within the legitimate sphere of the legislative power.''

In discussing the prior case of *Rose v. Salem,* 77 Or 77, 150 P 276, Mr. Justice RAND said:

''* * * That case was largely based upon the assumption that the statute having declared dogs to be personal property and having made them the subject of larceny, the right of ownership in dogs was thereby placed on the same plane of ownership as other personal property in general, and, therefore, the summary destruction of a dog without notice to the owner for a violation of a city ordinance would operate to deprive the owner of his property without due process of law within the meaning of the fourteenth amendment. * * *

''* * * * *

''If it were not for the fact that practically all of the decisions of the courts, including the Supreme Court of the United States, have decided this question adversely to the decision made in Rose v. Salem, supra, we would be constrained to apply to this case the doctrine there applied, if we were now passing upon a city ordinance and not an enactment by the legislative assembly of the state.''

However, dogs have generally been considered from a standpoint different from that applying to cattle, horses, sheep, and the like. The propensities of dogs set them in a class by themselves. Justice RAND recognized this difference in the Hofer case when, in concluding, he stated:

''What is said here is not intended to apply to statutes and ordinances providing for the impounding and sale of cattle, horses and the like. In such cases a different rule prevails.''

In a note to the case of *Randall v. Patch,* 118 Me 303, 108 A 97, 8 ALR 65, the author, at page 67, makes this statement:

> "The decisions generally deny, on the ground that the owner is deprived of property without due process of law, the constitutionality of statutes and ordinances providing, without notice *and hearing,* for the destruction of abandoned or disabled animals, *other than dogs,* enacted chiefly from humanitarian motives." (Italics ours.)

Many cases are discussed in the note, with a special discussion relating to statutes respecting dogs. In the principal case, *Randall v. Patch,* the Maine court held that the owner of an animal is deprived of his property without due process of law by its destruction, upon condemnation by a citizen as injured or diseased beyond recovery, without notice to or opportunity for hearing by the owner. The Maine court said:

> "Notice and opportunity for hearing are of the essence of due process of law. * * *
>
> "A hearing before a judicial tribunal is not essential, but there must be notice and a reasonable opportunity for a hearing before some tribunal."

Defendants also cite in support of their contention the case of *State v. Schriber,* 185 Or 615, 639, 205 P2d 149. This case concerns itself with a state statute enacted for the purpose of controlling and eradicating Bang's disease in cattle. Under the Act cattle which are found to be infected with the disease must be slaughtered. In discussing the contention that the law violated the due process clause of the constitution, Mr. Chief Justice Lusk, speaking for the court, said:

> "It is established beyond all controversy that a law enacted by the state to prevent the spread of contagious or infectious diseases among animals is a valid exercise of the police power, and that

to accomplish this legitimate end the state may, without violating the guarantee of due process, authorize the destruction of such animals by summary proceedings."

There is little, if any, dissent from the principle announced in the Schriber case. The same rule applies to statutes for the protection of vegetation against disease or infection. *Bowman v. Virginia State Entomologist,* 128 Va 351, 105 SE 141, 12 ALR 1121, and note commencing at page 1136. Moreover, it is universally held that buildings privately owned that are in the path of a fire may be summarily destroyed to prevent a spread of the conflagration. There are many other instances where privately owned property may be summarily disposed of to prevent the spread of contagion, or where a danger to the public health or safety is imminent therefrom, without violating the due process clause. These are cases where absolute necessity for the protection of the public welfare demands immediate action, but such summary destruction of private and lawful property without notice and hearing cannot ever be justified upon the basis of mere expediency, and when it is not reasonably necessary. *Lawton v. Steele,* 152 US 133, 14 S Ct 499, 38 L ed 385, *King v. Hayes,* 80 Me 206, 13 A 882; *Dunn v. Burleigh,* 62 Me 24; *McConnell v. McKillip,* 71 Neb 712, 99 NW 505, 65 LRA 610, 115 Am St Rep 614; *Greer v. Downey,* 8 Ariz 164, 71 P 900.

Those cases, however, are a far cry from the situation of the horse whose only offense is eating some of the grass on the open range that might otherwise be eaten by animals that have been certified by license or permit as authorized to graze.

We will briefly note some of the other authorities cited by defendants. In *Baldwin v. Ensign,* 49 Conn

113, 44 Am Rep 205, it was held that a horse unlawfully at large on a highway is a nuisance, and its owner is liable for any damage done by it, whether or not the animal is vicious. In *City of Waco v. Powell,* 32 Tex 258, a city ordinance declaring hogs running at large to be a public nuisance, and providing for their impoundment and sale after due notice, and a right of the owner to claim the proceeds of the sale, less expenses, was upheld. In *Stickley v. Givens,* 176 Va 548, 11 SE2d 631, a statute providing for prevention, control, and eradication of contagious and infectious diseases in livestock and poultry was upheld. In *Rowland v. Morris,* 152 Ga 842, 111 SE 389, the statute provided for state-wide tick eradication. In *Atkinson v. City and County of Denver,* 118 Colo 322, 195 P2d 977, an ordinance providing for the eradication of squirrels as nuisances was held to be a valid exercise of the police power. In *Graham v. Kingwell,* 218 Cal 658, 24 P2d 488, a state statute relating to diseases of bees was held constitutional. In *Aguiar & Bello v. Brock,* 24 F Supp 692, the U. S. District Court for the Southern District of California upheld a California statute that provided for the application of tuberculin test to cattle and for the destruction of such cattle as react positively to the test. In *North American Cold Storage Company v. City of Chicago,* 211 US 306, 29 S Ct 101, 53 L ed 195, the United States Supreme Court held that due process of law is not denied the owner or custodian of food in cold storage by a municipal ordinance under which such food, when unfit for human consumption, may summarily be seized, condemned, and destroyed by municipal officers without a preliminary hearing. The court pointed out, however, that if in fact the food was not unfit for human consumption, the owner had his right to sue for damages.

Those decisions in no way aid in solving the problem now before this court. The decided differences between the enactments involved in them and the Oregon horse roundup statute are obvious.

We are not concerned with the validity of this statute as applied to the wild horses roaming the ranges of southeastern Oregon. Like all other wild animals, they are recognized as being the property of the state, and the state can dispose of them as it sees fit. No private individual has any right in them that is entitled to protection against the superior right of the state. This ownership right of the state in wild animals forms the basis of our fish and game laws. 3 CJS 1087, Animals, § 5. The state may declare such wild horses to be public nuisances and direct or permit their complete elimination by killing or otherwise. There is scarcely any limit upon the power of the state with respect to them, but different rules apply when we are dealing with privately owned horses. As to such horses, the validity of all police regulations must pass the judicial test of reasonableness.

The basis for the other sections of the roundup statute is found in § 1. The remaining sections of the Act merely spell out the manner and procedure for the disposal of the horses after they have been rounded up, except § 6, which provides for a notice prior to the roundup.

Section 1 applies to *all* horses running at large upon any public lands within the state without license or permit. We find no law of this state, nor of the United States, that requires a license or permit for horses to run at large upon the public domain, outside of forest reserves, except in those limited number of grazing districts formed pursuant to the provisions of the Taylor Grazing Act and the provisions of §§ 32-1307

to 32-1319, incl., OCLA (ORS 606.010 to 606.120). The Act itself does not specifically make it unlawful for horses to run at large upon public lands, nor does it provide for licenses or permits. The Taylor Grazing Act does require such license or permit and makes it unlawful and punishable by fine for one to permit horses to run at large within the districts formed under that law without such license or permit, but the districts formed under the Taylor Grazing Act are limited in number and cover only a small portion of the state. The roundup statute applies state-wide, although it may have been designed for particular use in southeastern Oregon. Furthermore, we find no general statute of this state making it unlawful to permit horses to run at large upon unenclosed public lands. Nor is there any general federal law to that effect. The federal government has long acquiesced in the use of the public domain by livestock owners for grazing purposes. As we said in *Big Butte H. & C. Ass'n v. Anderson,* supra, at page 182:

"Outside of the government forest reserves, where the occupation and use of the public domain for grazing cattle and sheep is regulated by permits, there has been no technical recognition of the right of citizens to graze their stock on government land. It has been a case of tacit acquiescence on the one hand and on the other, of custom on the part of the stock owner. No one will deny the right of the government summarily to disregard the range custom on government land and to cause such use to be discontinued, or to place it under such restrictions as it chooses."

We take judicial notice of the fact that there are vast areas of public lands within the state lying outside established grazing districts and forest reserves.

By § 1 of the Act the legislature has delegated to

any agency of the state of Oregon or of the United States having management or control of the public lands the authority to round up, impound, and dispose of all horses running at large without license or permit. It may, by contract with a competent person, authorize such person to round up, impound, and dispose of the horses. Sections 2, 3, and 4 then provide the details respecting the disposal of the horses collected in the roundup, both as to the wild horses and those privately owned.

By § 2 of the Act, all *unbranded* horses rounded up *are arbitrarily declared* to be *abandoned or wild horses* and, as such, a *public nuisance,* and the ownership thereof vested in the state of Oregon. The agency causing such animals to be rounded up is given *carte blanche* authority to sell or otherwise dispose of them; all this without any hearing or investigation to determine whether the horse is, in fact, a wild horse or a privately owned animal. As we have before observed, a brand on a horse is not made a condition to the issuance of a permit to graze under the Taylor Grazing Act. We have no state statute that makes it mandatory to brand horses or other livestock. We do have statutes that provide for the recording of brands and prohibiting any person using a brand unless it is recorded, and making recorded brands evidence of ownership, but none of those statutes makes it unlawful for one to own or possess an unbranded animal. §§ 32-1111 to 32-1124, OCLA (ORS 604.110 to 604.220).

It is obvious that the absence of a brand mark on a horse could have nothing whatever to do with the question of whether such horse is, in fact, an abandoned or wild horse. Nor does the presence or absence of a brand mark have anything to do with the question of whether an animal is, in truth, a public nuisance.

Yet, under § 2, solely because of the absence of a brand mark, the horse is declared to be an abandoned or wild horse, a public nuisance, and the property of the state.

Two of the animals involved in this litigation were described as unbranded colts, one pinto colored and one roan colored. Under § 2 of the Act, these animals, when rounded up, became the property of the state. They were abandoned and wild horses and public nuisances, according to the statutory mandate. The record does not disclose the age of these colts, but they may have been three or four years old. A colt is "an animal of the horse species, whether male or female, not more than four years old." 11 CJ 1228. Some of our most valuable horses are colts. Horse racing fans in particular will testify to that.

In 39 Am Jur 285, Nuisances, § 8, it is stated:

> "A public nuisance has been defined as the doing of or the failure to do something that injuriously affects the safety, health, or morals of the public, or works some substantial annoyance, inconvenience, or injury to the public, and as a nuisance which causes hurt, inconvenience, or damage to the public generally, or such part of the public as necessarily comes in contact with it. According to Blackstone (4 Commentaries 166) 'common or public nuisances are offenses against the public order or economical regimen of the state, being either the doing of a thing to the annoyance of the King's subjects or the neglecting to do a thing which the common good requires.'"

A legislative declaration that a certain thing constitutes a public nuisance is not final. It has no power to declare that to be a public nuisance which in fact is not. What constitutes a public nuisance is a judicial question. *Houston v. Lurie,* 148 Tex 391, 224 SW2d

871, 14 ALR2d 61, 66, and note commencing at page 73; 39 Am Jur 294, Nuisances, § 13.

It is manifest that the mere absence of a brand on a horse constitutes no menace to the safety, health, welfare, or morals of the public. Declaring an *unbranded* horse, as distinguished from a *branded* horse, a public nuisance is an arbitrary and unreasonable exercise of the police power; such distinction has no basis in fact or in law.

It will be observed that the statute does not declare that all horses running at large without license or permit, whether branded or unbranded, shall be deemed public nuisances; it makes such declaration only as to unbranded animals. Moreover, nowhere in the act do we find any specific declaration that grazing without license or permit constitutes a public nuisance. It is plain that such grazing does not constitute a nuisance per se. 39 Am Jur 289, Nuisances, § 11.

Sections 3 and 4 of the Act relate to branded horses that are caught in the roundup, § 3 dealing with the recorded brands, and § 4 with unrecorded brands. Section 3 would apply to the 17 head of branded horses owned by plaintiff.

Under § 3, if a branded horse is caught in the roundup, bearing a brand recorded with the State Department of Agriculture of the state of Oregon, then the owner must be notified by registered letter, or by actual notice, that the horse is in the possession of the agency or its agent. If the animal is not claimed within two days after receipt of such notice by the owner and the roundup charge paid, then the horse is deemed abandoned and subject to disposal as provided in § 2.

No opportunity is given an owner to be heard upon the questions of (1) whether in fact the horse was

running at large within the meaning of the statute or (2) whether the owner had a license or permit for it to graze upon the public domain. Upon expiration of two days after he receives his registered letter or actual notice, if the owner fails to reclaim possession, or fails to pay the fee fixed in the contract as the roundup charge, his horse immediately becomes an abandoned horse and subject to being disposed of in the same manner applicable to wild horses.

In passing, we note that the Act makes no provision for the disposal of the funds received upon the sale of the animals that are rounded up. Do those funds go to the federal government, to the state, to the county, or to the contractor? Some of the horses gathered up, those privately owned, might well sell for more than the $25 roundup charge. In most statutes providing for the impoundment and sale of animals running at large, provision is made for the payment to the owner of the money received on the sale, less the expenses incident to impoundment, sale, and care; but the statute now under consideration is wholly silent as to those matters.

It is obvious that if the horse is sold for more than the roundup charge, the retention of the overplus by the contractor, the Federal government, the state, the county, or any agency, rather than its return to the owner, would in effect constitute the imposition of a penalty against the owner. We must keep in mind that when unlicensed and privately owned horses are permitted to graze on the public domain in violation of the provisions of the Taylor Grazing Act, *the offense is that of the owner,* for which he may be punished criminally. Yet under no circumstances can his guilt be established or a penalty imposed without a judicial hearing. In *Lawton v. Steele,* 119 NY 226, 23 NE 878,

7 LRA 134, 138, 16 ASR 813 (Aff. 152 US 133, 38 L ed 385, 14 S Ct 499), the court said:

> "It [Legislature] could not decree the destruction or forfeiture of property used so as to constitute a nuisance, as a punishment of the wrong, nor even we think to prevent a future illegal use of the property, it not being a nuisance *per se,* and appoint officers to execute its mandate. The plain reason is that due process of law requires a hearing and trial before punishment or before forfeiture of property can be adjudged for the owner's misconduct. Such legislation would be a plain usurpation by the Legislature of judicial powers, and under guise of exercising the power of summary abatement of nuisances, the Legislature cannot take into its own hands the enforcement of the criminal or quasi criminal law."

In the Lawton case, fish nets worth about $15 each and used in illegal fishing were seized and destroyed. The New York court upheld the validity of the statute that authorized the summary abatement of the nuisance and the destruction of the nets. The United States Supreme Court affirmed, but in doing so stressed the small value of the nets. Three justices dissented, including Chief Justice Fuller. *Lawton v. Steele,* 152 US 133, 144, 38 L ed 385, 14 S Ct 499, supra. The decision of the majority has been criticised: Freund, Police Power 559, § 527. However, the statute of this state now under consideration will not meet the test announced by the majority of the U. S. Supreme Court in the Lawton case. After inviting attention to statutes authorizing the condemnation of property used for illegal purposes by judicial proceedings, the Supreme Court said: (152 US 140)

> " * * * In all these cases, however, the forfeiture was decreed by judicial proceeding. But where the property is of little value, and its use

for the illegal purpose is clear, the legislature may declare it to be a nuisance, and subject to summary abatement. Instances of this are the power to kill diseased cattle; to pull down houses in the path of conflagrations; the destruction of decayed fruit or fish or unwholesome meats, or infected clothing, obscene books or pictures, or instruments which can only be used for illegal purposes. While the legislature has no right arbitrarily to declare that to be a nuisance which is clearly not so, a good deal must be left to its discretion in that regard, and if the object to be accomplished is conducive to the public interests, it may exercise a large liberty of choice in the means employed. [Citing cases.]

"It is not easy to draw the line between cases where property illegally used may be destroyed summarily and where judicial proceedings are necessary for its condemnation. If the property were of great value, as, for instance, if it were a vessel employed for smuggling or other illegal purposes, it would be putting a dangerous power in the hands of a custom officer to permit to sell or destroy it as a public nuisance, and the owner would have good reason to complain of such act, as depriving him of his property without due process of law. *But where the property is of trifling value,* and *its destruction is necessary* to effect the object of a certain statute, we think it is within the power of the legislature to order its summary abatement." (Italics ours.)

Privately owned horses could hardly be deemed of "trifling value", nor is their destruction necessary to effect the object of the roundup statute. The primary object of the statute is to remove these unlicensed, as well as the truly wild, horses from the range.

The summary seizure and sale of fish nets used in violation of the statute was condemned by this court in *Nicklas v. Rathburn,* 69 Or 483, 488, 139 P 567, as constituting a denial of due process.

The sale of a privately owned horse found running at large in violation of the law, or its destruction, as provided under the roundup statute, deprives the owner of his property. If it sells for a sum in excess of the reasonable expenses incident to rounding up, corralling, and caring for it (the roundup charge), and the overplus is not paid to the owner, there occurs a complete forfeiture of the property. If it is summarily killed, it is clear that a forfeiture also occurs, although the statute does not use the term "forfeiture". In *State v. 1920 Studebaker Touring Car et al.*, 120 Or 254, 269, 251 P 701, there was involved a statute of this state providing for the forfeiture of vehicles found transporting intoxicating liquor in violation of the law. The Act authorized any circuit court of the state to which a return of seizure was made to try, *without a jury,* the question whether such vehicle was subject to forfeiture under the statute. The court held the statute invalid insofar as it denied a jury trial. In deciding the issues, Mr. Justice RAND, speaking for the court, used the following significant language:

"* * * The property involved here is not intoxicating liquor, nor any other article which under the law is deemed contraband. Automobiles [like privately owned horses] are property in the highest sense, and cannot be destroyed because some unlawful use may have been made of them. When used for unlawful purposes, they may become subject to forfeiture, but the proceedings under which the forfeiture is to be worked must be proceedings in which the party who is to be deprived of his property, is accorded all of his constitutional rights."

Defendants claim that "reasonable notice to the owner prior to the sale of the animal running at large is all that is required to sustain the validity of estray statutes", citing 2 Am Jur 797-799, Animals, § 143,

147, and *Howell v. Daughet,* 148 Ark 450, 230 SW 559, 18 ALR 63. We agree with defendants, but in doing so, we wish to emphasize the word "reasonable". The provisions of the Arkansas statute, and particularly the notices therein provided for, have nothing in common with the notice provided for by this roundup statute. We also have an estray statute: §§ 32-1401 to 32-1408, OCLA (ORS 607.305 to 607.340). The procedure provided for in the Oregon statute is quite similar to that of the statute of Arkansas. The discussion of the Arkansas court might well apply to the Oregon law. Yet there is nothing in the Arkansas decision that can be interpreted as approving a notice (without any hearing whatsoever) such as that provided in § 3, nor do we find any support for such a notice in the citations from American Jurisprudence.

In arguing that the two days' notice provided for in § 3 is reasonable, defendants, in their brief, say:

"It is submitted that when all the circumstances surrounding these roundups are considered, this period of notice is reasonable and as long as the conditions properly permit. In the first place, we stress again that notice must actually be received before the two day period starts to run. It is logical to assume, of course, that the owners of most branded animals rounded up would live somewhere in the general vicinity of the area where the roundup was being made, but even if they resided at a considerable distance away, with automobiles and other means of rapid transportation, two days is ample time to allow a man, if he must, to reach any place within the State of Oregon. Also, there is a very definite reason why a longer period of notice cannot be given or fairly expected. We have already dwelt upon the distances involved, the inaccessible character of the country, and the lack of roads and other facilities. In making these roundups, it is difficult

and expensive to hold the horses for any length of time, as makeshift corrals and the like must normally be constructed, and feed and water for them must usually be hauled in for long distances over primitive, often well nigh impassable roads.

"All this makes for a most expensive operation. * * * If, on top of all this, an extended waiting period was required after the owner received his notice, it simply would not be possible to dispose of the unredeemed animals at a profit and accordingly, no one would undertake the job of rounding them up. These physical conditions and economic considerations provide a very definite and powerful reason for keeping the period of notice down to an absolute minimum."

The conditions outlined by defendants demonstrate almost conclusively that a mere two days' notice is unreasonable. Of what use is a motor vehicle (other than a Jeep or construction equipment) in a rough, roadless area, or in an area where the roads are "well nigh impassable"? The corral where the horses are gathered may be located anywhere within the district, far from human habitation. If motor transportation is impracticable, then just how would an owner get to the corral, or later transport his animals to their home range? It is manifest that in most instances, the owner's sole recourse would be riding horses, the time immemorial and usual means of transportation in livestock grazing areas; a comparatively slow, but sure, method of travel. It is obvious that a reasonable notice after impoundment would be necessary for the owner's protection. The statute itself recognizes the necessity of such notice. The fault in the statute rests in the fact that the notice provided is not reasonable under the circumstances.

■ Mere convenience, expediency, danger of losing a profit (whose profit?), or added expense will never

justify a denial of an individual's constitutional right to due process,—reasonable notice and an opportunity to be heard before his lawful property is taken by the state. Summary action is never justified in cases involving property having a lawful use, unless absolute necessity for the immediate protection of the public health, safety, or welfare demands it. No such necessity exists with respect to these comparatively few privately owned animals, even though they were trespassing upon the public domain.

If in fact or in law they constituted a public nuisance while grazing upon the public domain without a license or permit, the nuisance was abated by their being rounded up and corralled. Corralled, they presented no further menace to the public welfare. Immediate sale or destruction was not necessary for any reasonable purpose. Obviously, to enable the roundup agencies to make *a profit* on the sale is not such a purpose.

In *Adams v. Milwaukee,* 144 Wis 371, 129 NW 518, 43 LRA NS 1066, 1079 (Aff. by U. S. Supreme Court in 228 US 572, 57 L ed 971, 35 S Ct 610), there was involved the validity of an ordinance of the city of Milwaukee, Wisconsin, providing for the summary seizure and destruction of milk brought into the city, which had been produced by cows that had not been subjected to tuberculin tests and found free from tuberculosis or other contagious diseases. The court upheld the validity of the ordinance. It pointed out the considerations making it necessary to act summarily in the protection of the public health and safety. In passing upon the question, the court said:

"* * * When authorized by legislation, whether contained in the municipal charter or in

general statutes, municipal corporations may enact and enforce ordinances for the abatement of public nuisances and the preservation of the public health. *When the nuisance is abated by destruction of property, there must exist a necessity for resorting to this drastic and unusual method of enforcement.* A case must be presented in which the usual sanction of fine or imprisonment, or the abatement by suit in court, or indeed any milder or slower method of dealing with the offender than destruction of his property, would be inadequate to preserve the public health or safety." (Italics ours.)

Under § 3 of the roundup statute, branded horses belonging to a known owner are involved. To deprive the owner of his property in the same, either by sale or destruction, after only two days' prior notice, would indeed be a drastic and unusual method of enforcing the law, a method clearly not justified by *necessity* in the protection of the public health, safety, or welfare.

In 39 Am Jur 455, Nuisances, § 184, it is stated:

"In the exercise of the police power the state may authorize its officers summarily to abate public nuisances without resort to legal proceedings and without notice or a hearing. In general, the public authorities may take such steps as are reasonably necessary to abate the nuisance, * * *.

"However, the power of summary abatement by the public authorities is not without limitations. And it has been said that the right of an officer in this respect is no greater than that of a citizen. *The right is based upon necessity, and the necessity must be present to justify its exercise.* Also, the exercise of the remedy must be confined to doing what is *necessary* to abate the nuisance. * * * The least expensive and most efficacious method of abating the nuisance must be adopted, * * *." (Italics ours.)

454

In 39 Am Jur 459, Nuisances, § 186, it is further stated:

> "In many cases, a nuisance can be abated only by the destruction of the property in which it consists. Generally, the legislature may provide for the summary destruction of property of which the use is in violation of law and declared by statute to be a nuisance, at least where it is of little value and its use for the illegal purpose is clear. And municipal corporations having authority to abate public nuisances generally have power, both at common law and under statutes, to destroy the thing which constitutes the nuisance *if it cannot be abated in any other way.* * * *
>
> "* * * * *
>
> "To warrant the abatement of a nuisance by the destruction of property in any case, *there must exist a necessity for this unusual and drastic method,* and it must be shown that any milder or slower method of dealing with the offender would be inadequate to preserve the public health or safety. *The right exists only where the nuisance cannot be abated in any other recognized way,* * * *." (Italics ours.)

There is no doubt but that the state may regulate or prohibit the running at large of livestock and authorize their being taken up and sold to pay the reasonable costs and expenses of impounding, keeping, and selling, upon reasonable and proper notice to the owner. But all such regulations must be reasonable. Estray statutes are of this type of legislation. There is some conflict among the authorities respecting the necessity of a judicial hearing before such livestock found running at large in violation of the law is sold or destroyed, but there is no conflict as to the necessity of reasonable notice to the owner prior to such sale or destruction. 16 CJS 1487, Constitutional Law, § 706b.

In *McConnell v. McKillip,* 71 Neb 712, 99 NW 505,

65 LRA 610, 615, 115 Am St Rep 614, 2 Ann Cas 898, the Nebraska court considered a statute similar to that involved in the case of *Nicklas v. Rathburn,* supra, and arrived at the same conclusion we did. In the McConnell case the deputy game warden seized three shotguns being used in violation of the game laws. The Nebraska statute authorized such summary seizure and an immediate disposal of the property. The court held that portion of the Act unconstitutional as amounting to a denial of due process. In passing upon the question, the court said:

"There is a clear and marked distinction between that species of property which can only be used for an illegal purpose, and which, therefore, may be declared a nuisance and summarily abated, and that which is innocent in its ordinary and proper use, and which only becomes illegal when used for an unlawful purpose. We know of no principle of law which justifies the seizure of property, innocent in itself, its forfeiture, and the transfer of the right of property in the same from one person to another as a punishment for crime, without the right of a hearing upon the guilt or innocence of the person charged before forfeiture takes effect."

Freund, in his work on Police Power, p 557, § 525, states the following rules:

"The power of summary abatement does not extend to property in itself harmless and which may be lawfully used, but which is actually put to unlawful use or is otherwise kept in a condition contrary to law. So if a certain kind of transportation is a nuisance this does not justify the tearing up of railroad tracks. A house of ill-fame may not be torn down summarily; a building where liquor is kept unlawfully for sale may not be destroyed, and a canal may not be destroyed because not kept in a clean condition.

"The unlawful use may, however, be punished, and the punishment may include a forfeiture of the property used to commit the unlawful act. While in many cases this would be an extreme measure, it is subject to no express constitutional restraint except where the constitution provides that every penalty must be proportionate to the offense."

And on page 558, § 526, Freund further says:

"Such forfeiture is not an exercise of the police power, but of the judicial power, i.e., the taking of the property does not directly subserve the public welfare, but is intended as punishment for an unlawful act. Hence forfeiture requires judicial proceedings, either personal notice to the owner, or at least a proceeding *in rem* with notice by publication.

"There is perhaps in some cases some confusion between the police power and the judicial power owing to the fact that property unlawfully used may tend to assume the character of a nuisance *per se.* Animals running at large are not infrequently impounded and sold *upon notice to the owner*; but dogs may, if kept in an unlawful manner, be destroyed summarily, because they are at best qualified property." (Last italics ours.)

Section 4 deals with branded horses whose brand has not been recorded with the State Department of Agriculture. If the state brand inspector present at the roundup does not personally know the owner of such horses so branded, then they become subject to the provisions of § 2. If he does know the owner, then § 3 applies. In other words, it is left solely to the personal knowledge of an individual whether a given horse is immediately declared to be an abandoned or wild horse and the property of the state, subject to summary sale, killing, or other disposal, or whether it is to be treated as a branded horse whose brand has

been recorded as provided in § 3. It is to be noted that no investigation or hearing is provided for to determine the facts. The arbitrary determination of the brand inspector based solely upon what he may or may not know personally is final. This clearly amounts to an unconstitutional delegation of legislative authority in violation of Art 3, § 1, of the Oregon Constitution, as well as a denial of due process under the Fourteenth Amendment. *LaForge v. Ellis,* 175 Or 545, 154 P2d 844; 42 Am Jur 342, Public Administrative Law, § 45.

We have given attention to all of the numerous authorities cited and quoted from by the parties in their several briefs, but find it unnecessary to refer to any more of them. The recent case of *U. S. v. Hatahley,* supra, involving the provisions of the Utah "abandoned horse" statute, is not in point, particularly because of the decided differences between the Utah statute and that of this state now under consideration. Furthermore, no constitutional question was raised or discussed in that case.

We agree with the able trial judge that the several sections of the Act are not separable, and that the law constitutes an unreasonable and arbitrary interference with rights to private property without due process of law. The rule as to separability is stated in 2 Sutherland, Statutory Construction 3d ed 178, § 2404, as follows:

"In determining separability, legislative intent governs, but intent that the act be enforced in so far as valid is not the sole consideration. If the legislature so intended, the valid parts of an act will be upheld 'unless all the provisions are connected in subject matter, dependent on each other, operating together for the same purpose, or otherwise so connected together in meaning that it can-

not be presumed the legislature would have passed the one without the other.' To be capable of separate enforcement, the valid portion of an enactment must be independent of the invalid portion and must form a complete act within itself. The law enforced after separation must be reasonable in light of the act as originally drafted. The test is whether or not the legislature would have passed the statute had it been presented with the invalid features removed.

"Conversely, where the valid parts of an act are not independent and may not be said to form a complete act separate from the invalid party, the act must fall as a whole.

"In statutes not containing a separability clause, the independence of the valid portion of a statute will be a principal indicia of the legislative intent that the statute be separately enforced."

■ Although this court is always reluctant to hold an act of the legislative assembly invalid, nevertheless, we do not hesitate in declaring ch 211, Oregon Laws 1951, unconstitutional and void insofar as it may affect privately owned horses.

The judgment is affirmed.

WARNER, C.J., and LUSK and BRAND, JJ., dissent.

ROSSMAN, J., specially concurring.

■ I concur in the result reached by the foregoing decision and, likewise, in the principles of constitutional law which it employs, but I prefer to rest my opinion upon the grounds which I will now state.

Section 6 of the statute under attack (Oregon Laws, 1951, ch 211, ORS 607.405 to 607.435) makes provision for a notice which must be published before the agency begins a roundup. The notice is intended to apprise owners of horses which may be within the area where

the roundup will occur that, unless they remove their horses from the area, the process contemplated by the statute will take its course. Manifestly, the provision for notice was prompted by a belief that a horse which is trespassing upon the public range should not be forfeited unless the owner was first afforded an opportunity to recover it. Trespass by the horse alone does not suffice, under the challenged statute, to forfeit the owner's title to his horse.

ORS 607.430 (Section 6) follows:

"Before any roundup of horses is held, the agency responsible for the roundup shall cause notices of such fact to be published in a newspaper of general circulation in the area in which the roundup is to be held. The notices shall be published not less than twice, at least 10 days prior to the time the roundup is to begin. The notices shall state:

(1) The date the roundup is to begin.

(2) The place where horses collected in the roundup are to be held.

(3) That persons claiming ownership of any such horses may retake possession of horses collected from the public lands which have been running at large without license or permit of any kind, upon payment of the established roundup charge."

It will be observed that ORS 607.430 requires that the notice shall include these three items of information: (1) "The date the roundup is to begin"; (2) "The place where horses collected in the roundup are to be held"; and (3) "That persons claiming ownership of any such horses may retake possession * * * upon payment of the established roundup charge". The statute does not require the notice to include anything else. Presumably, if the notice appeared among the

classified ads of a newspaper it would meet the statute's demands.

It will be observed that the statute does not require that the published notice shall state the boundaries of the roundup area. Likewise, it does not demand that the published notice shall indicate the period within which the roundup will be conducted, say, three months or a half year, and confine the length of the roundup to that term. In the case at bar, the horses which are mentioned in the complaint were captured about three months after the publication occurred, and the contract afforded the men who conducted the operation one year within which to rid the range of horses.

Let us now consider the significance of the statute's omission to direct that the published notice shall specify the locale where the roundup will occur. The statute requires the published notice to state "The place where horses collected in the roundup are to be held". It may be that a designation of the place where the corral is located would afford horse owners an inkling as to the area from which the agency will remove horses. By resort to the notice which was employed in the instance out of which this case developed, we may be able to determine whether mention of the location of the corral gives an impression of the area where the roundup will be conducted.

The published notice began with the word "Notice". Then came a salutation which read as follows: "To the State of Oregon, Malheur County, and all owners of horses running at large on open range lands." That salutation is so general that it cannot be deemed valid unless a notice which employed no salutation whatever would have been valid. It will be observed that the

seventh and eighth words of the notice are "Malheur County". Approximately one half of the area described in the published notice lies in Harney county, which is not mentioned in the notice at all. Hence, horse owners in Harney county could readily have been misled by the notice. We suggested the question a moment ago as to whether mention in the notice of "The place where horses collected in the roundup are to be held" might give an impression of the area where the roundup operations would take place. The notice which was published stated that the horses would be held at "the Craig Cochran ranch south of Rome and the Gene L. Krueger ranch four miles north of Crane." Rome is a tiny place on the easterly line of the roundup border and Crane is a small site upon the area's westerly line. One who knew nothing about the place of the impending roundup except that the latter would use corrals near Crane and Rome would not know whether the operations would be conducted north, south, east or west of those places. Hence, designation in the published notice of "the place where horses collected in the roundup are to be held" would afford inadequate notice. Moreover, the statute does not require that "the place where horses collected in the roundup are to be held" must be located within the roundup area. If the corral is located outside the roundup area, the statute would not be violated, and, of course, mention of such a place would give no indication of the locale of the contemplated roundup.

During the oral argument, counsel stated that Malheur county is approximately the size of the state of Maryland. Harney county is about the same in area as Malheur county. The south boundary line of the roundup area extended one fourth across Harney county and all the way across Malheur county to the

Idaho line. North and south, the area did not include the entire length of the two counties. Nevertheless, the seat of operations was large, and a year was allotted to the men who, under contract, gathered in the animals. The statute, as we have seen, affords notice to horse owners only through the provisions of ORS 607.430 which require nothing more than that a notice shall be published twice, not less than ten days before the roundup begins. The publication, so the statute reads, is to appear "in a newspaper of general circulation in the area in which the roundup is to be held." That requirement exacts little and can readily be met. *U. S. Mortgage & Trust Co. v. Marquam,* 41 Or 391, 69 P 41. The fact that those who drafted the notice included in it more than required (a description of the roundup area) cannot lend validity to the statute. The administrative officials can never round out a defective statute by doing something more than it demands.

I have resorted to the published notice only for the purpose of showing what was done in the case at bar. The small piece of paper which was published ten days before the roundup began was the solitary notice under the statute's terms to all owners of horses within the vast area covered by the impending roundup that, unless they returned their horses to their own ranches, they might forfeit them to the state. The roundup could have continued for a year, yet the few lines of the published notice would have been the sole means whereby horse owners would have been apprised that unless they brought in their horses the latter might be forever lost. Although, in the instant case, the notice designated the roundup area, the statute did not exact the description. It seems inconceivable that a published notice to horse owners could serve the purposes of this statute unless it included a description

of the roundup area. Very likely the draftsmen of the statute inadvertently omitted the requirement.

In determining the validity of the challenged statute, we must bear in mind the fact that it governs, not only the fate of wild horses which are owned by no individual, but also that operations authorized by it may affect adversely horses owned by ranchers. For example, estrays may be included among the animals that are driven into the roundup corral. Possibly the draftsmen of the act did not intend to sweep within its ambit estrays, but the latter can be excepted from the act's embrace only by resort to unauthorized interpretation. It is clear that the author of the act foresaw that branded horses which are in private ownership may also be included in the roundup. The owners of such horses can obtain their return only by prompt action and the payment of the roundup charge if the horses were not licensed to enter upon the public range. Obviously, the low-flying airplanes which drive the animals toward the corral cannot distinguish between the licensed and the unlicensed horse, and, accordingly, licensed horses may be herded into the corral. It is true that the roundup contractors have no lawful right to include licensed horses in the herd, and that they render themselves liable to the owners whenever they do so, but, nevertheless, the owners are adversely affected whenever a licensed horse is rounded up and put to death. When that occurs the owner, instead of having a horse, has a claim against the contractors who conducted the roundup.

The foregoing indicates that when the act made provision for notice, the legislature must have realized that a notice, adequate to the situation which we have described, should be published. A notice which

fails to indicate place and time appears to be inadequate.

■ The statute under attack contemplates that owners should be afforded an opportunity to remove their estrays and other trespassing horses from the public range before a roundup begins. It seems fair to assume that the legislature had in mind a notice which is adequate to its purpose. See Merrill on Notice, § 757, and Mott, Due Process of Law, pages 208-240. By failing to require that the published notice should specify the area, and through the further failure to limit the time for conducting the roundup to some specified period, ORS 607.430, in my opinion, is invalid.